IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Peter B., Jimmy "Chip" E. and Michelle M., | ) Civil Action No. 6:10-767-JMC-BHH |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Marshall C. Sanford, Emma Forkner, Beverly Buscemi, Kelly Floyd, The South Carolina Department of Health and Human Services and The South Carolina Department of Disabilities and Special Needs, | ) **OF MAGISTRATE JUDGE** |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

The plaintiffs have brought this action seeking declaratory and injunctive relief for

violation of Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132;

Section 504 of the Rehabilitation Act of 1973 (Section 54); and 42 U.S.C. § 1983. This

matter is before the Court on the plaintiffs' motion for injunctive relief pursuant to Fed. R.

Civ. P. 65(b).[1]  [Doc. 12.]  The defendants have filed numerous responses [Docs. 18, 19,

28, 47, 70], and the plaintiffs have replied [Doc 44].  The plaintiffs ask the Court to enjoin

the defendants from reducing or terminating certain medical and personal-care services, the

absence of which would allegedly force the plaintiffs from their homes and communities into

disability institutions and other like facilities.  In addition to the full briefing of the parties, the

---

[1] There is also a motion to dismiss and a motion to amend Complaint pending in this case. Those outstanding matters remain under consideration and will be resolved shortly.

Court allowed and considered the *amici curiae* brief filed by Protection and Advocacy for People with Disabilities, Inc., the South Carolina Chapter of the National Academy of Elder Law Attorneys, and South Carolina Legal Services in support of the plaintiffs' motion. Moreover, a hearing on the motion was held before the Court, on September 28, 2010.

Based upon the parties' respective representations at both hearing and on motion, the Court has allowed this case some opportunity to be resolved through changed circumstances at the state level. [Doc. 28.] It has become apparent over time that a resolution is now in order.

## BACKGROUND

The plaintiffs are three individuals who have varying degrees of severe mental retardation and/or related disabilities. Peter B. has mental retardation, hydrocephalus, diabetes and coronary heart disease. (See Pl. Exs. 1, 3.) Chip E. has normal intelligence and severe cerebral palsy and a speech disorder. (See Pl. Ex. 9.) Michelle M. has autism, profound mental retardation, cerebral palsy, a bipolar disorder and is unable to speak. (See Pl. Ex. 4.)

The defendant South Carolina Department of Disabilities and Special Needs ("DDSN") provides services to individuals, like the plaintiffs, with developmental disabilities such as mental retardation and autism, and to some individuals with head and spinal cord injuries. *See* S.C. Code § 44-21-10 *et seq.* The vast majority of DDSN's funding derives from the federal Medicaid program, passed through to DDSN from the state Medicaid agency, defendant South Carolina Department of Health and Human Services ("DHHS").

Medicaid funds are used by both of these defendants to provide services to individuals in long-term institutions and to enable individuals to live in the community with appropriate supports. *See generally* 42 U.S.C. §§ 1396a & 1396n(c). Because some conditions of federal Medicaid law are waived in order to provide certain groups of people with disabilities services in the community rather than in institutions, these programs are referred to as "waivers." *See generally Doe v. Kidd*, 501 F.3d 348, 359 (4th Cir. 2007). In other words, qualifying individuals may either choose to live, and receive care, in a state institutional facility or they may "waive" that opportunity and elect to live in the surrounding community, with the aid of in-home medical and personal-care services. Importantly, using Medicaid funds for waiver services, rather than for institutional care, enables eligible recipients to remain in less restrictive settings in compliance with the United States Supreme Court's decision in *Olmstead v. v. L.C. ex rel. Zimring*, 527 U.S. 538 (1999), discussed below.

Defendant DDSN operates the waiver relevant to this action: the Mental Retardation and Related Disabilities Waiver (MR/RD Waiver). The MR/RD Waiver is for persons who (1) have an intellectual disability (mental retardation) or a related disability, (2) are eligible for Medicaid, and (3) who need home and community based services in order to live in the community. *See generally* DDSN MR/RD Waiver Manual, Chap. 1.6. All individuals on the waiver must require a threshold level of care that is similar to that required to receive services in a nursing home. *See Doe v. Kidd*, 501 F.2d at 351. Notwithstanding, they live in a variety of settings. *Id*. at 351-352. Some of these settings are small community-based facilities, like a Community Training Home (CTH), which provide residential services. *See*

3

*id.* Some of the settings are homes owned or rented by the individual or a family member. Individuals, who live in their own home or the home of a friend or family member, receive a variety of services to meet their care needs.

In late 2009, DHHS, which is the single state agency responsible for the Medicaid program, sought and received the approval of the United States Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) to amend the waiver to limit or cap certain services. (Def. Ex. 3, Attach A.)  The defendants represent that the amendments to the waiver were born out of the indisputably difficult economic climate of severe state budget reductions and further were intended to eliminate disparities between people with similar disability needs and to reduce superfluous and redundant services. (Forkner Aff. ¶ 5-7.)  Effective as of January 1, 2010, the amended waiver placed a service use cap, or flat cap, on the number of hours an individual could receive for particular services: Personal Care I and II, Adult Attendant Care, Adult Companion Care, Nursing, and in-home Respite services.  *Id.*

The summary of the capped services, relevant here, are as follows:  Personal Care II services were capped at 28 hours per week, or four hours per day. Respite services were also capped, at 68 hours per month, or slightly over two hours per day.

Importantly, these caps affected two of the plaintiffs, Chip E. and Michelle M.  (Lacy Aff. at 3-5.) The precise kind and level of services provided each of the plaintiffs both prior to, and after, the waiver amendments has been the source of some disagreement between the parties and the subject of numerous and disparate representations in declarations and

briefs of the same. Corralling the data has been less than a straight-forward process. This is the Court's best estimation and summary of the evidence, concerning each plaintiff respectively.

**Jimmy (Chip) E.**

| Service | Before 1/1/2010 | After 1/1/2010 (proposed/actual) |
|---|---|---|
| Personal Care II | 52 hours per week | 28 hours per week |
| In-home Respite | 112 hours per month | 68 hours per month |

(Pl. Reply at 6-8, Attach. 1 at 22, 37, 47, 49, 51, Attach. 12.)

**Michelle M.**

| Service | Before 1/1/2010 | After 1/1/2010 (proposed/actual) |
|---|---|---|
| Personal Care II | 56 hours per week | 28 hours per week |
| In-home Respite | 28 hours per week[2] | 30 hours per week |
| Institutional respite[3] | 0 | 0 |

(Pl. Reply at 11, Attach. 4 at 81, 93, 95.)

Much energy could be devoted to outlining the services allegedly now available to the plaintiffs and the ostensible alternatives, available or not, depending on the arguments

---

[2] The defendants put forward evidence that the plaintiff had up to 240 hours per month. (See Lacy Aff.) The plaintiffs have responded that she was never provided that many hours and that the 30 hours per week allotted in May 2010, was an increase of only 2 hours. (Pl. Reply at 11, Attach. 4 at 81.)

[3] The defendants originally submitted testimony that she was provided 2 weeks of institutional respite per year. The plaintiffs have rejoined that no such service has ever been available. (Pl. Reply, Attach. 4 at 81.)

of the parties. The plaintiffs have done a persuasive job of establishing the hours they have received and the defendants, aside from their original representations, have done little to effectively counter, either in their filings or at hearing. The Court, therefore, has largely adopted the plaintiffs' evidence concerning services and hours provided, whether discussed specifically herein or not. To the Court, it is sufficient to say that there has been a diminution in service hours for both Chip and Michelle, which, as will be discussed, their treating physicians find significant. More to the point, it is this reduction in hours that the plaintiffs contend will drive them to an institution against their will and hope and in violation of the Americans with Disabilities Act.

The third plaintiff, Peter B., receives services in a DDSN residential placement, as part of a Supervised Living Program II (SLP II). The care needs for individuals in DDSN residential placements are met through the residential habilitation service, during periods of the day when the individual is receiving residential habilitation services. For example, if individuals receiving residential habilitation need assistance with their meals, then the residential habilitation provider is responsible for seeing the need is met. (See Lacy Aff. at 2 & Attach. B.) Those, like Peter, receiving residential habilitation have not had caps placed on the number of hours of Personal Care they can receive, unlike those individuals who live in their own homes. *See id.,* Attach. A. However, Peter contends that 12 hours of "one-on-one" services were terminated as duplicative and not covered by Medicaid. (See generally Lucy Aff. at 2-3.) The termination of those services occurred in July 2009. *Id.* Like Michelle and Chip, Peter contends that the elimination of these services will effectively result in

forced and undesired institutionalization.

Lastly, the Court would acknowledge that the plaintiffs have commenced administrative actions concerning these same services, which are at varying stages of resolution. Most notably, it appears that Peter's appeals have been denied. [See Doc. 70.] The Court will address the effect of these proceedings to the extent relevant, but, as will be discussed, finds them to be largely non-dispositive or otherwise non-preclusive of this Court's consideration.

## DISCUSSION

This is a fact intensive and messy case. From its procedural and statutory dimensions to its medical ones, it is substantial. In its review, the Court has attempted to narrow the necessary attention to be applied. Of course, the individual circumstances and incidents of the plaintiffs' particularized needs tend to additionally layer the inquiry. The whole thing is a delicate matter and, certainly for the plaintiffs, much would seem to hang in the balance. They have an unquestionably powerful story, which has moved the undersigned, in sympathy, if not in the specific formation of this decision's many contours. Sympathetic considerations, however, are largely outside this Court's purview. As always, there is a legally correct answer to the dilemma posed, which this recommendation attempts to approximate, in general result if not perfect detail. The care the plaintiffs require is complicated, burdensome, and inexact. In some respects, there is no easy answer to their situations. But certainly, if anyone knows what might be the best, among many less than perfect alternatives, it is the plaintiffs, their families, and their physicians. To credit those

accounts, earnestly, seems in keeping with the manner in which these cases are to be considered.  *See Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring) ("The opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference.")  The defendants do much good for the disabled persons of our larger community and the Court is aware of the appropriate bases, economic and otherwise, which have motivated the decisions at issue here on behalf of a much larger populace than the individuals prosecuting this case.  With that said, and based on the following, as considered in light of the hearing, both in its argument and evidence, and the many briefs of the parties and *amici*, the Court has concluded that a preliminary injunction should lie.

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 128 (2008) (internal quotations omitted). Rule 65 of the Federal Rules of Civil Procedure governs the issuance of Preliminary Injunctions.  Pursuant to Rule 65, "a temporary restraining order may be granted . . . only if it clearly appears from specific facts shown . . . that immediate and irreparable injury, loss, or damage will result to the applicant." In its recent opinion in *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 374-76 (2008), the United States Supreme Court articulated clearly what must be shown to obtain a preliminary injunction, stating that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*. at 374.  Critically, all four requirements must be satisfied.  *Id*.

Indeed, the Supreme Court in *Winter* rejected a standard that allowed the plaintiff to demonstrate only a "possibility" of irreparable harm because that standard was "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 375-76.

Before the Supreme Court's decision in *Winter*, the standard articulated in *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977), governed the grant or denial of preliminary injunctions in the Fourth Circuit. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811-14 (4th Cir.1991); *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359-60 (4th Cir.1991);

In *Real Truth About Obama, Inc. v. Federal Election Com'n*, 2009 WL 2408735 (4th Cir. August 5, 2009), the Fourth Circuit expressly concluded that the *Blackwelder* standard stood "in fatal tension with the Supreme Court's 2008 decision in *Winter*." *Id.* at *3. That decision, however, was vacated by the United States Supreme Court for reasons unrelated to the Fourth Circuit's discussion concerning preliminary injunctions. *See Real Truth About Obama, Inc. v. Federal Election*, 130 S. Ct. 2371, 2371 (U.S. 2010) (vacating and remanding for further consideration in light of *Citizens United v. Federal Election Com'n,* 130 S.Ct. 876 (U.S. 2010)).

It seems that the vacated Fourth Circuit decision still remains some good indication of how this Circuit would view application of *Winter*. In *Real Truth* the Fourth Circuit, stated that a plaintiff must now show that he will "likely succeed on the merits" regardless of whether the balance of hardships weighs in his favor. *Id.* Moreover, the standard for

likelihood of success on the merits requires more than simply showing that "grave or serious questions are presented" for litigation. *Id*. Second, the plaintiff must make a clear showing that he will likely be irreparably harmed absent preliminary relief. *Id*. That the plaintiff's harm might simply outweigh the defendant's is no longer sufficient. *Id*. Moreover, this showing of irreparable injury is mandatory even if the plaintiff has already demonstrated a strong showing on the probability of success on the merits. *Id*. Third, the Court is admonished to pay "particular regard" to the "public consequences" of any relief granted. *Id*. Lastly, there no longer exists any flexible interplay between the factors; all four elements of the test must be satisfied. *Id*. A failure to establish any of the elements necessary for relief is, therefore, fatal to the request for a temporary restraining order. *Winter*, 129 S.Ct. at 374.

Applying the standard in *Winters*, the Court finds that the plaintiffs have established entitlement to a preliminary injunction. Each element will be considered in turn.

### Likelihood of Success on the Merits

Title II of the Americans with Disabilities Act of 1990 (ADA), prohibits discrimination by public entities against individuals with disabilities. *See* 42 U.S.C. § 12132. The United States Supreme Court has held that prohibited discrimination under the ADA includes "unnecessary segregation" and "unjustified institutional isolation of personal disabilities." *Olmstead v. L.C.*, 527 U.S. 581, 600-02 (1999). The Supreme Court's determination was based, in part, on the Department of Justice regulation, usually referred to as the "integration mandate," which requires states to administer services "in the most integrated

10

setting appropriate to the needs of the qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (amended at 75 F.R. 56164-01, adding a section "h" to § 35.130). The most integrated setting appropriate is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Olmstead*, 527 U.S. 581, 592 (citing 28 C.F.R. pt. 35, App. A. p. 450, redesignated App. B at 75 F.R. 56164-01). In other words, it is discrimination, on account of a person's disability, to create obstacles to their ability to live normally in their community.

In *Olmstead v. L.C.*, the United States Supreme Court found a violation of the ADA, ruling in favor of disabled individuals seeking to reside in the community, rather than in a segregated facility. *Olmstead*, 527 U.S. at 607. The Court emphasized the Preamble of the ADA and the accompanying Congressional finding that "society has tended to isolate and segregate individuals with disabilities" and that the issue continues to be a "serious and pervasive social problem." *Id*. at 600. The Court held that the integration mandate of the ADA governed the plaintiffs' claims. *See Olmstead*, 527 U.S. at 588.

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id*. at 607.

To state a claim under Title II of the ADA based on a violation of the integration mandate, the plaintiff must prove that (1) the State's treatment professionals have

determined that community-based services are appropriate; (2) the disabled individual does not oppose treatment; and (3) the provision of community-based services can be reasonably accommodated, taking into account the resources available to the state and the needs of other disabled individuals.[4]   *Olmstead*, 527 U.S. at 587.   Critically, a State's failure to provide services to a qualified person in a community-based setting as opposed to a nursing home or institution presents a violation of Title II of the ADA. *See id.*; *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003) (imposition of cap on prescription medications placed on participants in community-based program at high risk for premature entry into nursing homes in violation of the ADA).

At this juncture, the plaintiffs have presented evidence demonstrating that their services are being terminated by defendants in violation of the ADA sufficient to justify interim equitable relief. The defendants, focused almost exclusively on the irreperability of the harm alleged, have not really made much argument regarding the plaintiff's likelihood of success on the merits.  The Court will consider each element of the substantive claim, in turn.

In regards to the first, there is no dispute between the parties that the plaintiffs, who have been successfully living in their own homes for numerous years, are deemed eligible for community-based living by the State's experts.   Concerning the second element, the

_____

[4] Under the specific paradigm of the ADA, the elements of the claim have been articulated as follows:  (1) is a "qualified individual with a disability;" (2) was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003).

very existence of this lawsuit, and every representation of the plaintiffs made herein, attests to a complete lack of any objection to community-based living; that is their plain and affirmative desire – to live in their communities.

Lastly, whether the provision of community-based services can be reasonably accommodated, taking into account the resources available to the State and the needs of other disabled individuals, the plaintiffs have put forward evidence that in all material respects it is less costly to provide the community-based, in-home services than institutional ones. (Compare Pl. Ex. 10 with Ex. 11.) To wit, capped respite services for Michelle M. were enjoyed at a cost of $70/day compared with the alternative provision of those same services in an institution at $320/day. (Pl. Exs. 4, 5, 23.) Likewise, the record reveals that Peter B.'s requested one-on-one companion services cost less than $200/week before their elimination under the amendments and that the alternative offer by the state to enroll him in a Workability workshop would cost more than $220/week.[5] (Pl. Ex. 1 at 4.) Similarly, the services Chip E. has been receiving during 2010 cost $39,424.25, approximately one-third of the cost of institutional services. [See Doc. 44-10 at 269.] The same institutional services would cost approximately $116,000.00 a year. [See Doc. 44-11.] As to all potential disabled persons affected by the amendments, the plaintiffs have put forward evidence that the number of waiver participants and the likely length of time for such participants in institutional facilities would increase, with a concomitant increase in overall and service-

---

[5] These figures were represented by the plaintiffs to the Court. Their exact source is not clear. Regardless, the record does, in the least, admit to a greater cost for alternative services than the ones requested by Peter B. (Pl. Ex. 1 at 4.)

specific costs.  (Compare Pl. Ex. 10 with Ex. 11.)

Olmstead, instructs that the State is exempted from the integration mandate only where a "fundamental alteration" of the States' services or programs is required.  Olmstead, 527 U.S. at 591-92.  Not only do the plaintiff's not request any alteration, fundamental or otherwise, but they beg for a returned status quo, which is apparently cheaper for the State, and better for the individuals, than the amendments.   The Court cannot understand, and the defendants have not explained, how the requested community-based services could be "reasonably accommodated" any better.  See Olmstead, 527 U.S. at 587.

The defendants' only real rejoinder is that, as of this moment, actual institutionalization of the plaintiffs has not occurred and that there exists no credible risk of it, such that any argument concerning cost differential is effectively speculative and premature.  The argument seems simultaneously to go to the merits consideration and the irreparability of the harm alleged.  The defendant argues it as to the latter.  The Court will make some comment in both sections, but principally, here, under the merits analysis.

To echo the briefs of the plaintiffs and the amici, cases involving ADA integration claims have consistently recognized that even the risk of institutionalization is sufficient to establish a violation of Title II and certainly to justify preliminary relief.   See Fisher v. Oklahoma Health Care Authority, 335 F.3d 1175, 1184 (10th 2003) (holding that Medicaid participants not currently institutionalized but at "high risk for premature entry into a nursing home" could bring claim for violation of the integration mandate); Brantley v. Maxwell-Jolly, 656 F. Supp. 2d 1161, (N.D. Cal. 2009); Mental Disability Law Clinic v. Hogan, 2008 WL

14

4104460, at *15 (E.D.N.Y. Aug. 28, 2008) (stating "even the risk of unjustified segregation may be sufficient under *Olmstead*").  The case law is clear that plaintiffs need not wait to be institutionalized before relief is sought.

Illustratively, the Eastern District of North Carolina recently granted emergency injunctive relief, prohibiting the State from reducing home-based services to persons who had a dual diagnosis of mental retardation and mental illness, just three days after the plaintiffs in that case filed their complaint alleging violation of the ADA; there, the plaintiffs were at risk of having to move from independent apartments to group home or institutional facilities.  *See Marlo M. v. Cansler*, 679 F. Supp. 2d 635 (E.D.N.C. Jan. 17, 2010).  While the plaintiffs had not been institutionalized at the time of the filing of the complaint, the district court concluded that a likelihood of success on the merits existed because the plaintiffs had shown that the State's termination of funding *threatened* to force the plaintiff's from their then present living situations into group homes or institutional settings.  *Id*. at 638*; see also Ball v. Rogers*, 2009 WL 1395423, at *5 (D. Ariz. April 24, 2009) (holding that failure to provide plaintiffs with needed services threatened plaintiffs with institutionalization, prevented them from leaving institutions, and in some instances forced them into institutions in order to receive their necessary care  in violation of the ADA and Rehabilitation Act); *Hogan*, 2008 WL 4104460, at *15 ("[E]ven the risk of unjustified segregation may be sufficient under Olmstead"); *M.A.C. v. Betit*, 284 F.Supp. 2d 1298, 1309 (D. Utah 2003) (adopting *Fisher's* position that a plaintiff need not currently be institutionalized to bring suit).

Specifically, here, the plaintiffs have put forward the following evidence concerning

15

the risk of institutionalization posed by the elimination of various services. Concerning Peter B., his treating physician has documented Peter's physical and psychological deterioration since the elimination of the requested services (Reel Aff. ¶ 7-9) and has expressed the opinion that "if the services are not restored, Peter risks loss of the ability to live independently in a community setting and he will likely be placed in an institutional setting because of a decline in his physical and mental condition," *id*. ¶ 10. Likewise, Michelle M.'s treating physician, based upon Michelle's parents inability to assist and here, otherwise, absolute reliance on in-home services to keep her out of a facility, has further indicated that if relevant services were reduced, "Michelle would be likely to have to return to an institution." (Patterson Aff. ¶¶ 9, 10.) Chip E.'s treating physician has made comparable representations. [See generally Doc. 44-2.] These opinions have been given significant weight. *See Olmstead*, 527 U.S. at 610; *Crabtree v. Goetz*, 2008 WL 5330506, at *25 (M.D. Tenn. Dec. 19, 2008).

The defendants contend that the claim of Peter B.'s particular demand is betrayed insofar as he has been without the requested services since July 2009 and, yet, no institutionalization has been required. But, this is not conflicting medical testimony. Rather, it is an unsupported attempt to correlate the two events. The defendants cite administrative findings that the plaintiff has not met his burden to associate his weight loss with the diminution in one-on-one services. (Def. Resp. at 14.) But, besides the irrelevancy of the administrative conclusion regarding evidence which may or may not now be before this Court, Peter has, in fact, submitted evidence, here, that his weight loss is so related; that

16

it will dangerously affect his diabetes; and that those conditions will force institutionalization. (Reel Aff. ¶ 7-10.) The defendants have offered some evidence of Peter's fluctuating weight over the years. (Moore Aff. ¶ 4.) But, this does not precisely refute the opinion of Peter's treating physician that Peter's condition will continue to deteriorate such that institutionalization is inevitable. (Reel Aff. ¶ 7-9.) That evidence is uncontradicted. And, the Court would credit it.

The defendants further argue that the plaintiffs' claims are not "ripe" because SCDDSN has agreed to provide services at current levels to Michelle M. and Chip E. while their administrative appeals are pending in the South Carolina Administrative Law Court. It is true that federal courts may issue declaratory judgments only in cases of actual controversy. 28 U.S.C. § 2201. The defendants emphasize that the controversy must be "ripe" for judicial resolution, and that in the context of an administrative case, there must be "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *Charter Federal Sav. Bank v. Office of Thrift*, 976 F.2d 203, 208 (4th Cir. 1992). In a similar South Carolina ADA/Medicaid decision, however, the United States Court of Appeals for the Fourth Circuit expressly indicated that the administrative proceedings pending in the State courts were irrelevant to the federal claims. *See Doe v. Kidd*, 501 F.3d 348, 353 n.1 (4th Cir. 2007). The court stated:

> There have been state administrative proceedings in Doe's case since she noted her appeal to this Court. We do not consider the outcome of these proceedings because the outcome has no effect, preclusive or otherwise, on the issues Doe raises before this Court.

*Id.*

Moreover, in this case, the "formalized" administrative decision is the January amendments themselves, which of their own force exercise legal and binding effect over the plaintiff's circumstances. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149-50 (1967) (finding regulations themselves to be "final agency action"), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). The fact that the plaintiffs have challenged the amendments' specific application in the form of an administrative appeal, in addition to the judicial case here, does not make the actual regulatory amendments any less "formalized." The amendments were effective as of January 1, 2010, and there was no act of an administrative court necessary to formalize them any further. And certainly, the defendants cannot expect the plaintiffs, psychologically frail in the first instance, to rely on the vagaries of a promise that services will continue during the pendency of appeal. This lawsuit is their right, as far as the Court can tell.

The plaintiffs have met the burden to establish the three elements of their ADA integration claim. The Court would recommend, therefore, that the plaintiffs have shown a likelihood of success on the merits.[6]

---

[6] The Court has had some concern over the objection of the defendants that the one-on-one services requested by Peter B. are not properly allowable Medicaid services. Frankly, the defense has not been thoroughly briefed. As far as the Court can tell, the issue in the State administrative proceedings has largely turned on the perceived duplicative nature of those services to other services. [Docs. 19-1, 70-1, -2; Lacy Aff. at 2.] As to that point, the defendants' showing here is unavailing. The plaintiffs have submitted evidence that the one-on-one services are essential and not redundant. (See Reel Aff. ¶¶ 7-10.) It is true that the administrative law court appears to have agreed that the services were non-waiver services [Doc. 19-1], but the Court does not believe, and the defendants have not argued, that that determination is somehow binding here. Moreover, the adjudication that the services are non-waiver in quality does not appear to be dispositive. As the *amici* explains, the waiver program is merely an optional tool, which states can use to provide

### *Irreparable Harm*

The evidence at this point is strong that the plaintiffs will suffer regressive consequences if moved, even temporarily.  The plaintiffs have behavioral and special needs, and benefit from a stable environment and personalized treatment.  Information in the record indicates that they each have conditions or behaviors which make them poor candidates for group housing.

As a threshold legal matter, numerous federal courts have recognized that the reduction or elimination of public medical benefits irreparably harms the participants in the programs being cut. *See Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir.1982) (holding that possibility that plaintiffs would be denied Medicaid benefits sufficient to establish irreparable harm); *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004) (citing *Beltran* and finding irreparable harm shown where Medicaid recipients could be denied medical care as a result of their inability to pay increased co-payment to medical service providers); *Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006) (finding that state Medicaid agency's denial of coverage for a off-label use of prescription pain medication

_____

services in the community and to save money on providing institutional care. In other words, use of waivers is simply one way a state may meet the integration mandate of the ADA. "Medicaid can be an important resource to assist states in fulfilling their obligations under ADA. The [Home and Community-Based Services (HCBS)] waiver program in particular is a viable option for states to use to provide integrated community-based long-term care services and supports to qualified Medicaid eligible recipients." HCBS Waivers – 1915(c), at http://www.cms.hhs.gov/MedicaidStWaivProgDemoPGI/05_HCBSWaivers-Section1915%28c%29.asp (last viewed Nov. 22, 2010).  In other words, the status of the one-on-one services as non-waiver does not seem to absolve the defendants of their obligation to provide services to the plaintiff, which would keep in him the community as mandated by *Olmstead*.  Again, the issue has been thinly treated and may be better traced at a later procedural moment in this case.  For now, the Court has no reason to conclude either that the one-on-one services are non-waiver or, to the extent that they are, that such a determination matters.

would irreparably harm plaintiffs).  In other words, institutionalization, as a result of a denial of benefits, constitutes, legally speaking, the kind of harm which equitable relief is suited to enjoin.

More concretely, the plaintiffs have put forward evidence, specifically, of the kind of injury they would face.  As discussed, the decline in Peter B.'s mental and physical condition since the termination of his companion services has already been documented.  (Pl. Exs. 1, 3, 14.)  Soon after Peter B.'s companion services were terminated, his anxiety and depression increased. (See Pl. Exs. 1, 14.)  He lost nine pounds between the time that his companion services were terminated and the filing of this lawsuit.  *Id*. This physical deterioration is likely to exacerbate his diabetic condition without the supervision of his specialized diet and exercise provided by his companion service provider.  (Reel Aff. ¶ 7-10.) Peter's behavior support specialist and psychological services provider, Lennie Mullis, has indicated that Peter's ability to maintain employment, predicated on community living, is essential to his personal identity and mental health.  (Mullis Aff. at 2.)  The deterioration in his health, as previously cited, will jeopardize his ability to work, which will lead to both "depression and withdrawal."  *Id*. at 2-3.

The plaintiffs have also put forward evidence that Michelle M. is likely to suffer the same unexplained physical injuries she experienced when she was previously institutionalized.  (Pl. Exs. 4, 5.)  There, she mysteriously fell, resulting in the loss of teeth; was clawed on her neck and side to the point of scarring; broke her toe; fell into depression; lost weight; and had difficulty sleeping.  (Pl. Ex. 4 ¶¶ 14-19.)  The plaintiffs have offered

evidence that she would be at risk of choking from aspiration due to the elimination of speech and language services. (Pl. Ex 5.) In a congregate setting, there is evidence that Michelle M. will be at risk for infections, particularly of her stoma where she is fed through a tube into her stomach. (Pl. Exs. 5, 14.) It has been represented, and unrefuted, that Michelle M. pulls out her feeding tube when she tries to stand up while being fed. (Pl. Ex. 14.) She will likely have to be restrained in a chair if she is placed in an institution. Lastly, because of Michelle M.'s behavioral issues and loud outbursts, she is at great risk in a congregate setting of abuse by other residents, as well as by frustrated and frequently poorly trained staff members. (Pl. Exs. 5, 14.) These are not compensable injuries.

Lastly, the threat of irreparable injury to Chip E. is slightly more difficult to summarize. He is the highest functioning of the three plaintiffs and, maybe, precisely for this reason, the prospect of institutionalization is most terrorizing to him. (Pl. Ex. 9 ¶ 12.) The threat of irreparable injury to Chip exists exactly in the lost opportunity that community living offers. The evidence reveals that Chip is significantly involved with the Clinton High School Football team in substantive ways, all of which would be forfeited upon institutionalization. (Chip Aff. ¶ 6 .) This is precisely the sort of injury incidental to the prejudice of segregation, which the *Olmstead* mandate contemplates and seeks to redress. *See Olmstead*, 527 U.S. at 600-01 ("[C]onfinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.") His experience in an institution would come with all of the adjunct humiliations that violation of personal space

and person imposes. "Institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id*. Where such an experience can be avoided, without significant alteration of the *status quo*, the United States Supreme Court has stated, it should be.

The Court does not mean to insult the hard work of the defendants or the individual care providers that accomplish it, but it would be an oversight of this decision not to also emphasize the fairly serious deficiencies of various institutional facilities, revealed in a state agency audit, which include unsanitary conditions; abuse; neglect; and exploitation. [Doc. 44-10 at , 287, 308-09.] Institutions can be places of both great compassion and unspeakable horror. These are not insignificant considerations when measuring the irreparable harm and opportunity cost of a *de facto* involuntary institutionalization of a person otherwise content and healthy in community.

These various forms of psychological and physical harms posed by institutionalization have been recognized as irreparable and sufficient to justify injunctive relief. *See Marlo*, 2010 WL 148849, at *2; *Crabtree v. Goetz*, 2008 WL 5330506, at *30 (M.D. Tenn. Dec., 19, 2008). The Court would agree, on the record here. The cited opinions of the plaintiffs' treating physicians, which are entitled to deference, s*ee Olmstead*, 527 U.S. at 610; *Crabtree*, 2008 WL 5330506, at *25, create more than a mere "possibility" of irreparable harm, and instead suggest that such harm is "likely," *Winters*, 129 S. Ct. at 375-76. And the unfavorable resolution of Peter's administrative appeal, which the defendant emphasizes

as reason to deny an injunction here [see Doc. 70], is actually additional evidence of the likelihood that the plaintiffs' rights in necessary services will not be protected and that they will be forced into institutional facilities but for Court action, now.

For all these reasons, the plaintiffs have established a likelihood of irreperable harm.

### *Balance of Harms*

In contrast to the irreparability of the harm facing the plaintiffs, the harm to the defendants if an injunction is granted is at most slight. With an injunction, the defendants will only have to maintain the same level of funding they have provided to the plaintiffs for years and which, in the instances, of Michelle M. and Chip E., they maintain even now. Further, and as already detailed, the record indicates that maintaining the plaintiffs' current level of community based services actually presents an overall cost *savings* per year to alternative placements. To all of this, the defendants have made little rejoinder. They have not attempted to explain how the injunction would peculiarly burden them in any respect, much less to some degree more than the consequences posed to the plaintiffs in the absence of the same. The relief requested is temporary in nature; commensurate with what the defendants have largely been providing the plaintiffs even subsequent to the amendments; and demands no sort of systemic alteration. The request is for the *status quo* not some new buffet of benefit or other "fundamental alteration."

In all of its consideration, the Court does not mean to suggest that the call has been an obvious one. The defendants' objections largely sound in reasonableness and legal basis. Both the timeliness of this lawsuit and the urgency of the harm alleged, are matters

23

with which the undersigned has wrestled.  Whatever want of quality in the plaintiffs' claims as to the first two elements of their request for preliminary injunction is aided, here, where the balance of harms fails to raise any sort of alarm in the defendants' favor.  The plaintiffs lead difficult lives, and the Court would tend to take seriously any evidence which threatens the stability and viability of them, particularly where maintaining the current benefit levels so negligibly impacts the defendants.  The injunction may never be transformed into a permanent one, but in the interim, it is a small cost to provide temporary relief.  The Court does not mean to undercut the ultimate strength of its recommendation.  In all respects, the undersigned believes that an ongoing violation of the ADA is present.

### *Public Interest*

Finally, the public interest clearly weighs in favor of an injunction in this case.  First, the public has an interest in the application of the ADA and its particular legislative mandates and purposes. *See e.g. Fisher*, 335 F.3d at 1180; *Heather K. v. Mallard*, 887 F.Supp. 1249, 1263-66 (N.D. Iowa 1995).   Second, the information presently before the Court suggests that the plaintiffs request will actually cost taxpayers less money than the alternative care proposed by the defendants, which is obviously a matter of public concern. Again, these interests are not assailed by the defendants.

Accordingly, insofar as the plaintiffs have made sufficient showing concerning each element of their request for preliminary injunction, the Court would recommend that it lie.

## <u>CONCLUSION</u>

Wherefore, it is RECOMMENDED that the plaintiffs' Motion for Injunctive Relief [Doc. 12] be GRANTED and the defendants be ordered to maintain and/or return services in the quality, kind, and volume enjoyed by the plaintiffs prior to January 1, 2010, and, in the case of Peter B., prior to July 2009.

IT IS SO RECOMMENDED.

s/Bruce Howe Hendricks
United States Magistrate Judge

November 24, 2010
Greenville, South Carolina