IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION
CIVIL CASE NO. 6-10-CV-767-JMC-JDA

Peter B., Jimmy "Chip" E., and Michelle M.,
                              Plaintiffs,

     vs.

Marshall C. Sanford, Nikki Randhawa Haley, Anthony Keck,
Beverly Buscemi, Kelly Floyd, Richard Huntress, the
South Carolina Department of Health and Human Services
and the South Carolina Department of Disabilities and
Special Needs,
                              Defendants.

_____

Amended Complaint
_____

Peter B., Jimmy "Chip" E. and  Michelle M. (hereinafter referred to as the

("Plaintiffs") complaining of the Defendants herein, allege the following:

**INTRODUCTION**

1.     This civil rights action seeks declaratory and injunctive relief to prevent persons who

have severe disabilities from being forced into congregate living facilities, at a

significantly greater cost to the State, instead of providing them with services in the

least restrictive setting, which is their homes and communities.

2.     The Defendants have taken actions which contravene federal law in a number of

ways.  Changes in the way the South Carolina Department of Disabilities and Special

Needs (SCDDSN) and the South Carolina Department of Health and Human Services

(SCDHHS) provide services through the Mental Retardation/Related Disabilities

1

Medicaid waiver program, have violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12312 and Section 504 of the Rehabilitation Act of 1973,  29 U.S.C. § 794 ("Section 504"), thereby placing waiver participants at imminent risk of unnecessary and unwarranted out-of-home and out-of-community placement, including the risk of placement in institutions such as nursing homes, ICF/MR facilities, boarding homes and group homes, and by discriminating against the plaintiffs on the basis of disability.

3.      Defendants have also violated the requirements of Title XIX of the Social Security Act, 42 U.S.C. § 1396 et. seq. ("the Medicaid Act") which require States to (1) provide comparable Medicaid services to individuals with similar needs; (2) provide services in sufficient amount, duration and scope; (3) provide services according to reasonable standards; (4) provide services with reasonable promptness; (5) provide services from the participant's choice of providers; (6) inform waiver participants of all feasible alternatives under the waiver and (7) assure the federal government that the health and welfare of waiver participants is protected.

4.      Defendants have also violated Plaintiffs' Constitutional due process rights by denying their requests for fair hearings.  42 U.S.C. § 1396a(a)(3) and 42 U.S.C. § 431.

5.      At all times relevant to this action, Defendants have acted under color of state law.

## JURISDICTION AND VENUE

6.      This is an action for declaratory and injunctive relief for violation of the Supremacy Clause contained in Article VI of the United States Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution; Title XIX of

the Social Security Act, (the "Medicaid Act"), (42 U.S.C. § 1396 et seq.); Title II of

the Americans with Disabilities Act (the "ADA"); Section 504 of the Rehabilitation

Act of 1973 ("Section 504"), (29 U.S.C. § 794); and 42 U.S.C. §§ 1983 and 1988 of

the Civil Rights Act.

7.    Plaintiffs' causes of action for violation of the Medicaid Act are authorized by 42

U.S.C. §§ 1396a(a)(3) (due process), 1396a(a)(8) (reasonable promptness);

1396a(a)(10) (sufficiency); 1396a(a)(17) (reasonable standards); 1396a(a)(23)

(choice of provider); 1396a(a)(30) (equal access and adequate payment rates) and 42

C.F.R. § 441.302 (assurance of protecting health and welfare and financial

accountability of waiver participants).

8.    This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. 1331 and

1343(a)(3) and (4), Title II of the ADA (42 U.S.C. § 12132), Section 504 (29 U.S.C.

§ 794) and 28 U.S.C. § 1343 (deprivation of civil rights).

9.    Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and

Fed. R. Civ. P. 65.

10.   Venue is proper because a substantial part of the actions and omissions of which

Plaintiffs complain occurred in this Division. 28 U.S.C. § 1391(b).

**THE DEFENDANTS**

11.   **Marshall C. Sanford** is the former Governor of South Carolina. He is sued in his

individual capacity.  As "the supreme executive authority" and "chief magistrate" of

South Carolina, the former Governor had a duty to "take care that the laws be

faithfully executed." He was responsible for directing, supervising and controlling the

South Carolina Department of Health and Human Services (SCDHHS) and all long term care programs for persons who have disabilities. 42 C.F.R. § 430.12.

12.    Defendant Sanford acted in his official capacity as Governor and was at all times during his terms in the Governor's Office clothed with the authority of that office.

13.    Defendant Sanford should be held by this Court to be personally responsible to the Plaintiffs because he exceeded the authority of his office in causing funds to be diverted which were intended to provide services to the Plaintiffs and other disabled persons.

14.    Plaintiffs will show that beginning in 2002 and throughout his two terms in office, Governor Sanford and his Chiefs of Staff were informed by advocates, SCDDSN Commissioners and one or more agency officials about ongoing violations of the civil rights of waiver participants, violations of the Medicaid Act and the misappropriation of funds intended to provide waiver services and that Governor Sanford failed to exercise his power to correct and prevent these violations.

15.    These violations have repeatedly been confirmed by audits conducted by state and federal authorities during Defendant Sanford's terms as Governor, as well as by private auditors hired by SCDHHS, whose director is appointed by the Governor. These reports document that Plaintiffs have been placed at serious risk of harm if they have been threatened with bing forced against their wills into ICF/MR, CRCF (Community Residential Care Facilities), group homes, foster homes or workshops under the supervision of Defendants due to the failure to provide needed supports in the community.

16.    These violations continued in part because of the Governor's failure to comply with

South Carolina Code of Laws § 44-20-225, which required the Governor to appoint three consumer advisory boards of SCDDSN. Former Governor Sanford failed to appoint these boards despite repeated requests from advocates and former SCDDSN Commissioners.

17.    Defendant  Sanford prevented public review of actions taken by SCDDSN and ignored or failed to respond appropriately to reports made to his office of financial mismanagement and violations of federal law, which resulted in funds intended to provide waiver services being diverted for other purposes.

18.    **Nikki Randhawa Haley** is sued in her official capacity as Governor of South Carolina.  She is automatically substituted for the former Governor only in his official capacity and he remains as a defendant in his individual capacity. The Governor of South Carolina has the authority to appoint and remove members of the governing board of SCDDSN. South Carolina Code of Laws § 44-20-210.

19.    According to the Attorney General of South Carolina, the Governor is also the appointing authority for the governing boards of local disabilities and special needs boards and he has the authority to remove members of the governing boards of those agencies.  Opinion No. 06-005 of the South Carolina Attorney General.

20.    **Anthony Keck** is the current director of the South Carolina Department of Health and Human Services. He is sued only in his official capacity, at this time, as director of the cabinet level agency responsible for the administration of all Medicaid programs.

21.    **Beverly Buscemi** has served since November 2009 as the Director of the South Carolina Department of Disabilities and Special Needs.  She is responsible for the

5

administration of the policies and regulations established by the Commissioners of SCDDSN, who are appointed by the Governor. She is responsible for providing accurate information to SCDDSN Commissioners and to the South Carolina General Assembly in order to allow them to make informed decisions about waiver programs. Dr. Buscemi is sued in her individual and official capacities.

22. **Kelly Floyd** is the former Chairman of the Commission of the South Carolina Department of Disabilities and Special Needs, which is the governing board of the agency. She was personally involved in the decision to reduce and terminate waiver services.  Ms. Floyd is sued in her individual and official capacities.

23. **Richard Huntress** is the current Chairman of the Commission of the South Carolina Department of Disabilities and Special Needs and he is sued in his individual and official capacities. He also was personally involved in the decision to reduce and terminate waiver services.

24. Defendants are or were (in the case of Sanford) charged with the responsibility of protecting the civil rights of waiver participants and with complying with all federal laws related to the Medicaid program, including assuring compliance with the ADA and Section 504 and 42 U.S.C. § 1396 et. seq. (the Medicaid Act).

25. As a condition of accepting matching Medicaid funds from the federal government, Defendants Sanford, Haley, Keck and Buscemi assured the federal government that they have taken necessary safeguards to protect the health and welfare of Medicaid waiver participants who receive services in their homes and communities. 42 C.F.R. § 441.302.

26. **The South Carolina Department of Health and Human Services** ("SCDHHS") is

6

the agency that is responsible for the administration of all Medicaid programs in South Carolina. 42 C.F.R. § 431.10. SCDHHS contracts with SCDDSN to operate the MR/RD Medicaid waiver, but SCDHHS has a non-delegable duty to issue policies, rules and regulations on all program matters.

27.    **The South Carolina Department of Disabilities and Special Needs** is the agency with responsibility for providing services to persons who have mental retardation, related disabilities, such as cerebral palsy and epilepsy, and autism, as well as head and spinal cord injuries. Under South Carolina Code of Laws §44-20-250, SCDDSN has the responsibility to coordinate services and programs with other state and local agencies for persons with mental retardation, related disabilities, head injuries, and spinal cord injuries.

28.    Section 44-20-375 of the South Carolina Code of Laws establishes local county boards of disabilities and special needs (DSN Boards) by ordinance of local governing bodies. There are approximately 39 local disability and special needs (DSN) boards in South Carolina.

29.    SCDDSN, SCDHHS and the Office of the Governor improperly recognize three private corporations, the Babcock Center, Inc., the Charles Lea Center, Inc. and Berkeley Citizens, Inc., as local DSN Boards, although they are not public entities, a statutory requirement to be a DSN boards South Carolina Code of Laws §§ 44-20-375 to 385.

30.    The appointing authority for local DSN Boards, according to the Office of the South Carolina Attorney General is the Governor, who also has the power to conduct removal proceedings to remove members of local DSN Boards.  Op. No. 06-005.

## THE PLAINTIFFS

31.    Plaintiffs are persons who have severe disabilities who participate in the MR/RD Medicaid waiver program.   The MR/RD Medicaid waiver is a program specifically targeted to provide services to persons who have mental retardation or a related disability, such as cerebral palsy or epilepsy.

32.    Plaintiffs are at risk of institutionalization due to actions taken by SCDDSN which have been taken in violation of the ADA, Section 504, the ARRA, the Medicaid Act, 42 U.S.C. § 1396 et seq. and the Civil Rights Act.

33.    Peter B. and Michelle M. are represented in this matter through their Guardian Ad Litem, Sandra Ray. Chip E. has profound physical disabilities, but he does not have mental deficiencies and he is not represented by a guardian ad litem in this action.

34.    **Peter B.** is a 43 year old citizen of South Carolina who lives in an apartment in Spartanburg, South Carolina. Peter has moderate mental retardation, hydrocephalus, diabetes, coronary heart disease an anxiety disorder and a history of stress induced seizures.

35.    Peter formerly lived in an ICF/MR funded and supervised by SCDDSN, but in 1989, when he was 22 years old, SCDDSN determined that Peter could be served in the community and Peter was moved to an apartment supervised by the Charles Lea Center.

36.    These services are provided as part of the Supervised Living Program (SLP II).

37.    Peter's condition deteriorated when he was moved from the ICF/MR to this apartment and he experienced a serious loss of weight, depression and seizures when he was receiving "residential habilitation services" provided by the Charles Lea

8

Center.

38.     Because of the regression in his mental and physical health after discharge from the

        ICF/MR, in 1994 Peter began receiving services of an adult companion, funded

        through the MR/RD Medicaid waiver. This companion inventoried his food supply,

        assisted him in preparing a grocery list containing foods on a specially prepared

        diabetic diet, assisted him in planning activities, including physical exercise, when he

        does not work and accompanied him on activities away from his apartment complex

        on the weekends.

39.     After these companion services were started, Peter's condition improved

        dramatically.

40.     Peter has worked at the same job for more than twenty-one years. He works four days

        a week, but he receives limited exercise at his job site. His companion assured that

        Peter received the physical exercise his doctor has ordered on the weekends and he

        worked with Peter to increase his social and community integration skills, which

        improved his mental health status.

41.     Once Peter began receiving these companion services, he adapted well to this less

        restrictive setting, fully participating in the life of his community.  His level of

        anxiety and depression decreased with these services in place and his compliance

        with his diabetic diet improved.

42.     Peter's guardian filed a civil rights complaint against the Charles Lea Center with the

        Office for Civil Rights, United States Department of Health and Human Services.

        This complaint resulted in a 2001 audit which substantiated his guardian's complaints

        that the Charles Lea Center had improperly charged Peter $7,697 in transportation

expenses which had been paid by Medicaid. That audit identified other problems in the operation of the Charles Lea Center Supervised Living Program.

43.     As a result of this complaint, the Charles Lea Center was required to repay Peter for these transportation services which had been reimbursed by Medicaid. The Charles Lea Center made the last payment in satisfaction of this debt to Peter in December 2004. In resolution of Peter's complaint, the Charles Lea Center also entered an agreement signed on May 10, 2002. This legal agreement required the Charles Lea Center to comply with a Financial Management Plan obligating the Charles Lea Center to provide Peter tickets to community events.

44.     Soon after the last payment was made, a Charles Lea Center employee who has no medical training, determined without consulting Peter's physicians or obtaining any medical opinion, that Peter no longer needed these companion services.

45.     Peter's neurologist and internal medicine physician both determined that Peter's condition would deteriorate without these companion services.

46.     SCDDSN and SCDHHS upheld the decision of Charles Lea Center staff to terminate these services, without consulting Peter's treating physicians and without obtaining a medical opinion of his need for these services, which had been funded by Medicaid.

47.     SCDHHS bills Medicaid and pays SCDDSN more than double the actual cost of Peter's MR/RD waiver services (including the companion services).

48.     In 2005, Peter's MR/RD waiver services (including 12 hours a week of companion services) actually cost about $24,000.00 a year, while ICF/MR services would have cost the State more than $100,000.00 a year.  During 2005, SCDDSN billed and actually received payment (from Medicaid, including the state match) of more than

$50,000.00 for Peter's residential services, under his name and social security number.

49.    SCDDSN allows the Charles Lea Center to retain these "unspent" funds and to spend them for other purposes in the discretion of the Charles Lea Center.

50.    According to the first notice of intent to terminate these services, the director of the Charles Lea Center informed Peter's companion that these services were being terminated because the Center was operating in the red in 2005.  He informed Peter's guardian that the Charles Lea Center could no longer afford to continue Peter's companion services.

51.    Peter's physicians disagreed with the assessment of the Charles Lea Center employee who determined his companion services are not necessary.  Based on many years of treating Peter, these physicians determined that Peter's general neurological and mental health would deteriorate if these services were terminated.

52.    In 2005, Peter's guardian appealed the proposed termination of these 12 hours a week of companion services and he requested that 12 hours a week of Adult Companion Services be provided as ordered by his physicians.

53.    The SCDHHS hearing officer dismissed Peter's fair hearing appeal a year later, finding that SCDHHS is without jurisdiction to hear his case. The hearing officer determined that Peter did not have a right to receive a fair hearing on the termination of these companion services because SCDDSN and SCDHHS argued that those services were not funded by Medicaid.  The South Carolina Court of Appeals reversed and remanded the decision of the SCDHHS hearing officer and remanded his appeal to SCDHHS.

54.     Peter's guardian visited the Regional Offices of CMS (the federal Medicaid Agency) and the Office of Civil Rights in Atlanta in July 2009, complaining about SCDDSN and the Charles Lea Center violating the civil rights of Peter and other MR/RD Medicaid waiver participants.

55.     Although Defendants had agreed during the fair hearing proceedings to continue to provide Peter 12 hours a week of companion services during the appeal and the SCDHHS hearing officer ordered these services to be continued during the appeal, SCDDSN terminated these twelve hours of companion services in July 2009, while Peter's appeal was still pending.

56.     Although the Charles Lea Center decided to terminate Peter's services in 2005 because of claims of budget deficits, in 2007, during this time, the agency subsequently spent more than $2 million purchasing and renovating a large industrial building located on a Superfund site which was previously owned by Tyco Corporation.

57.     When SCDDSN provided funds to the Charles Lea Center to purchase this property, it contained unsafe levels of groundwater contamination.

58.     Deed restrictions prohibited the property from being used for human habitation, a nursing facility or a school, or even grazing cattle. Although these deed restrictions have not been lifted, the South Carolina Department of Health and Environmental Control approved using the property, which could not be used as a school or hospital, as an "industrial site."

59.     Now approximately 300 people who have disabilities are sent to the workshop on this Superfund site, where they perform work in windowless rooms, isolated and

segregated from non-disabled persons.

60. According to an audit conducted by the South Carolina Legislative Audit Council, during FY 06 and FY 07, SCDDSN spent more than $20 million of funds allocated for waiver services by the General Assembly for other purposes. December 3, 2008 audit of SCDDSN by the South Carolina Legislative Audit Council.

61. Because these funds were not spent providing Medicaid waiver services, more than $60 million of federal matching funds were lost.

62. In May 2009, upon information and belief, Emma Forkner, the director of DHHS and Defendant Sanford caused a proviso to be passed in the FY 2010 South Carolina Budget Act which requires "revenues" from labor of "mentally retarded trainees" in this and other SCDDSN workshops to be paid to SCDDSN.

63. Upon information and belief, many persons who have disabilities have been taken out of competitive employment, where they worked alongside non-disabled persons, and they have been sent to the Charles Lea Center "Workability" workshop in order to increase the "revenues" paid to SCDDSN.

64. Peter does not attend this segregated workshop and he does not to want spend his days in this setting where he would be isolated from non-disabled people.

65. It is undisputed that SCDDSN would pay for Peter to attend this congregate, segregated workshop, simultaneously with "residential habilitation" services.

66. The Adult Companion Services Peter received for more than a dozen years cost less than the cost of Peter attending this congregate, segregated workshop.

67. Assaults and workplace violence are prevalent at SCDDSN sheltered workshops but people who do not have disabilities are not expected to tolerate threats of harm from

co-workers, unlike those persons who attend these workshops.

68. Upon information and belief, persons who have disabilities who labor at the SCDDSN workshops receive less compensation than Peter earns at his job, where he is competitively employed.

69. Peter lost more than 11 pounds since his companion services were terminated in July 2009 and his general physical and mental condition have deteriorated significantly.

70. He has exhibited signs of depression and anxiety, which were present before these companion services were provided, but abated while he was receiving 12 hours a week of companion services.

71. If Peter's mental and physical health continue to deteriorate, according to his treating physician and psychologist, he will be unable to retain this job in the community and the loss of his job will be a tremendous emotional loss for Peter.

72. Peter's treating physicians warned SCDDSN that the termination of his companion services would be likely to cause "a downturn in his general and neurological health with resultant increased medical needs and expenses." Their predictions were correct.

73. This service is needed to assure that Peter consumes the 2,500 calories which have been prescribed by his physician. Peter is no longer receiving regular exercise, which his physicians have determined is necessary to prevent regression and deterioration of his physical and neurological condition.

74. Peter's anxiety increased after his companion services were terminated in July 2009 and his psychological services provider has determined that he is at great risk of psychological decompensation.  His depression has increased since these services have been terminated.

14

75.  Because of the termination of Peter's companion, his needs are inconsistently met by untrained staff who are frequently unavailable. This lack of knowledgeable, available staff  has escalated his physical and emotional problems.

76.  Peter's psychological services provider believes that Peter will have to move to a more restrictive congregate setting if this decline in his condition continues.

77.  Peter's provider of psychological services was also terminated by DDSN after being named as a witness in this case.  (Her appeal is pending before the South Carolina Administrative Law Court and she has filed a lawsuit alleging reprisal.)

78.  Peter has been placed at risk of harm due to the termination of twelve hours a week of adult companion services and he risks placement in an isolated congregate facility because his medical needs are not being met due to the loss of these services.

79.  Peter is at risk of having to move to a more restrictive and costly setting, in a residence with other disabled persons. Peter would be required to comply with house rules and schedules not chosen by him.  He would not be able to choose his foods, his bedtime, when he eats or what television program to watch.  His outings into the community would consist for the most part of traveling with other residents in a van and attending the events chosen by the staff or the group.

80.  Peter is entitled to receive services in the least restrictive setting, where he is treated as a valued citizen and is fully integrated into the life of the community.

81.   These Adult Companion Services may be provided without a fundamental alteration in the nature of the State's system.

82.  Defendants have failed to give deference to Peter's treating physicians in making treatment decisions and his health has declined, as they predicted since these services

were terminated. *Olmstead v. L.C.*, 527 U.S. 581 (1999).

83.    Despite evidence of medical necessity of these services and the lower cost of these

Adult Companion Services when compared with the cost of attending the workshop,

SCDDSN has refused to voluntarily restore these services during this litigation.

84.    In retaliation for her advocacy for Peter and his satisfaction with her services, Peter's

long time independent service coordinator was terminated after she was named as a

witness in this case and the Deputy Director of DDSN provided Peter's service

coordination records to another private provider, in violation of HIPAA, after Peter's

guardian informed Defendants that she exercised his right not to receive service

coordination services (targeted case management).

85.    **Chip E.** is 38 year old citizen of South Carolina who resides in his family home in

Clinton, South Carolina. Chip has normal intelligence, but he has severe cerebral

palsy and he uses a wheelchair for locomotion. Chip can control his wheelchair with

his mouth, but he has no use of his arms or his legs. He requires hands-on assistance

with bathing, dressing, eating and every other activity of daily living. His vision is

impaired.

86.    Chip is 6 feet tall and he weighs 185 pounds. He is completely unable to assist his

caregiver with moving from his bed to his wheelchair. His speech is impaired so that

only those persons who know Chip well can understand what he says.

87.    Chip meets all medical and financial qualifications to receive services, at taxpayer

expense, in an ICF/MR, the most expensive services provided by SCDDSN. If Chip

exercised his right provided by 42 U.S.C. § 1396n(c)(2)(C) to receive ICF/MR

services, federal law would require the State to provide these more expensive

institutional services with "reasonable promptness."  42 U.S.C. § 1396a(a)(8).

88.    Chip is an important and valued member of the Clinton High School Football team, which he coaches as a volunteer. Chip attends every home and away game and he has not missed coaching a game in more than 19 years. He proudly wears the gold ring he earned when his team won the State Football Championship last year.

89.    Every week, Chip uses his computer to write an inspirational letter to the team, which the coach reads to the team before the game. Chip prepares plays during the week which he sends by e mail to the head coach. The Clinton High School football team won the State Championship in 2009 using one of Chip's plays.

90.    In November 2009, the director of the Laurens County DSN Board sent a generic notice to waiver participants in Laurens County saying that SCDDSN intended to impose a cap on PCA services of 28 hours a week. This letter stated that SCDDSN was imposing a cap on respite hours of 68 hours a month. The letter, which was not addressed individually to Chip, states that "Receiving this notice does not mean your services are being reduced." These changes were scheduled to become effective on January 1, 2010 and the letter informed waiver participants that each waiver participant would be notified individually by their service coordinator before any services were reduced.

91.    The reason given for reducing these services was "significant shortfalls in revenue." According to the notice: "These revenue shortfalls have created budget reductions in every area of the state, including the Department of Disabilities and Special Needs." This letter did not refer to any regulation or law authorizing this reduction in services.

92.    On December 30, 2009, Chip's service coordinator sent a letter to Chip informing

17

him that if he appealed the reduction of his services, he would be personally responsible for the cost of these services if he lost his appeal. As before, no reference to a regulation or law was contained in this notice of reduction in services.

93. Since Defendants decided to reduce these services, tens of millions of dollars of federal stimulus funds received by SCDDSN since February 2009 have been paid to a rainy day fund, instead of using those funds to maintain services required by waiver participants to allow waiver participants to remain in their homes.

94. These waiver program amendments described in the generic letter from the DSN Board were first approved by the South Carolina Department of Health and Human Services Medical Care Advisory Committee in May 2009, without giving prior notice to the public, local DSN Boards or even to SCDDSN Commissioners.

95. Defendants failed to conduct an economic analysis to determine the cost effectiveness of reducing home-based waiver services before approving these amendments to the MR/RD Medicaid waiver program.

96. Defendants failed to conduct an individualized assessment of medical need before deciding to reduce home based waiver services.

97. Despite approving these reductions based on claims of "budget reductions," Defendants actually *increased* the reimbursement rate SCDDSN pays to itself and to its local DSN Boards for providing ICF/MR services from $157 a day to $270 per day.

98. ICF/MR facilities are nursing facilities for persons who have mental retardation or a related condition and they are the most expensive and restrictive setting in the SCDDSN system.

18

99.   Former Governor Sanford's proposed budget for FY 2010 increased the amount provided for institutional services (ICF/MR) by more than a million dollars a year, while significantly reducing funding for home-based services.

100.  Since that time, Defendant Sanford, and later Defendant Keck, have further reduced funding for home and community-based Medicaid services while maintaining or increasing amounts paid for institutional and congregate services..

101.  When Chip's service coordinator informed him about the amendments to the MR/RD Medicaid waiver program services, she told him that it would be futile to appeal these reductions. Later Chip learned that he was entitled to appeal those reductions and he filed an appeal with SCDDSN.

102.  Without providing the requested evidentiary hearing, on January 11, 2010, Dr. Buscemi responded to his appeal by upholding the reduction in Chip's PCA services. However, she overruled the reduction of his respite services. This letter failed to cite any rule, regulation or other legal basis for this denial/reduction and it does not inform Chip that receiving 240 hours a month of respite services is a "feasible alternative" under the waiver program.

103.  Despite Chip requiring assistance with every activity of daily living and a finding by Dr. Buscemi that Chip is "severely disabled," SCDDSN never conducted a medical assessment to determine whether Chip needed the maximum number of respite hours (240 a month) nor did Dr. Buscemi's letter inform him of the right under the new SCDDSN policy to receive up to 240 hours of respite services a month.

104.  When Chip attempted to appeal Dr. Buscemi's decision to SCDHHS, instead of providing a fair hearing, the hearing officer issued an "Interlocutory Order" requiring

Chip to prove an "error of fact or law."

105. Although discovery is not allowed in fair hearing appeals, Chip responded to the notice by asking the hearing officer to schedule a fair hearing.

106. Instead of providing Chip a hearing, on April 29, 2010 (more than 90 days after Chip requested a fair hearing), the hearing officer dismissed Chip's appeal without providing a fair hearing and that order is currently on appeal to the South Carolina Administrative Law Court.

107. Chip has been unable to use the respite hours that have been awarded because of the administrative barriers imposed by SCDDSN and the local DSN Board and the low rate of pay paid to respite caregivers.

108. Chip's personal care attendant arrives at his home in the morning and he is confined to his bed until she arrives. His personal care attendant bathes and dresses Chip. She assists Chip with the toilet, then prepares and feeds Chip breakfast. This process takes at least two-and a half hours, when Chip is well. He needs additional care when he is ill. This personal care attendant drives Chip to medical appointments and feeds him lunch before leaving his house.

109. In the evening, some nights Chip's uncle is around and will put him into the bed. Other nights, Chip sleeps in his wheelchair, because his father cannot lift him safely from his wheelchair to his bed.

110. Chip's family is no longer able to care for him. After willingly providing for his care in the family home for more than thirty years, his parents became physically unable to provide the care he needs to remain outside of an institution.

111. Chip's mother died in June 2010 and his father was hospitalized in July 2010.

112.    Due to impaired mobility, Chip is at greater risk of pressure sores and other medical complications if his home-based services are reduced. Federal and state governments spend billions of dollars to treat complications of pressure sores every year.

113.    In the likely event that Chip will develop pressure sores from having to sleep in his wheelchair without being repositioned regularly, he will require more expensive acute care, at significantly greater costs to taxpayers.

114.    The State can provide Chip with services he has requested in his own home without fundamentally altering the nature of the State's system by simply providing reasonable modifications to its programs that are less costly than ICF/MR services which Chip is entitled to receive.

115.    Chip's services at home cost less than his care would cost if he were forced to move to an institution and Chip's biggest fear in life is being forced to move to an institution.

116.    Defendants have not provided the fair hearing Chip has requested, which is required by 42 U.S.C. § 1396a(a)(3).

117.    Forcing Chip into an institution not only would be a tragedy for Chip, but it would be a huge personal loss for other citizens of the Clinton community, who place great value on his contribution to the life of the community.

118.    Chip is at immediate risk of being institutionalized if an injunction is not granted. If Chip were placed in an institution, he would be segregated and isolated from his family, friends and colleagues for extended periods of time. Chip would be at risk of being forced to leave his home community, because there are no beds available in Clinton.

119. Chip would likely be forced to live in a facility with persons who have cognitive disabilities who have mental health and behavioral challenges, where he would be stigmatized by the public due to his disability.

120. If Chip were forced to move to a congregate facility, he would not be secure in his personal possessions. He would be subjected to daily assaults on his right to privacy and basic human dignity.

121. Chip would no longer have the right to select and hire persons who assist him with activities of daily living of a most personal nature. Those decisions would be made by bureaucrats. Chip would be subjected to having strangers, not chosen by him, to touch him, bathe, dress and feed him. He would be dependent upon persons hired by someone else to come into and out of his room at all hours of the night and day. He would be dependent upon staff to provide intimate physical care. He would have to eat the foods chosen by someone else on a schedule they determine. He would be required to go to sleep and wake up on a schedule convenient to staff. He would be subjected to watching the television programs chosen by others, with his only option to retreat into his bedroom in the facility where he could not even shut the door without the assistance of facility staff.

122. Most likely Chip would be required to attend a SCDDSN funded congregate workshop during the day if he was moved to an institution, where "revenues" from his work would be paid to SCDDSN.  Section 24.1, Part 1B, South Carolina Budget Act for 2010-1011.

123. Non-disabled persons would consider such restrictions stigmatizing and a clear violation of their rights to privacy and self-determination.

22

124.  With reasonable modifications, Chip can be served at less cost in his home or another independent setting where he will not be isolated from his family, friends and his colleagues who work with the Clinton High School football team.

125.  Chip is at risk of immediate institutionalization, however, he is entitled under the ADA, Section 504 and the findings of the United States Supreme Court in *Olmstead v.L.C.* to receive services in his own community, outside of an institutional setting, with great deference provided to the treatment decisions of his responsible, treating physicians.  *Olmstead v. L.C.*, 527 U.S. 581 (1999).

126.  For months in 2009, Chip was unable to use the allocated respite hours because SCDDSN requires respite providers to attend training without being compensated and requires respite workers to provide background documentation at their own expense. SCDDSN caregivers who work in institutional settings are paid to attend training and the agency pays for documentation, such as SLED and driving records. Employees of SCDDSN institutional facilities (Regional Centers) and the Laurens County DSN Board receive Worker's Compensation and Unemployment benefits, sick and annual leave and health insurance.  Respite workers do not receive these same benefits and they are paid a lower hourly rate than caregivers who work in congregate SCDDSN funded facilities.

127.  After Chip's mother died, SCDDSN agreed to provide 240 hours a month of respite services, however, the Laurens DSN Board denied Chip's request for the higher "difficulty of care" rate because its service coordinator determined that his disabilities are not severe enough.

128.  PCA services are provided by private providers of MR/RD Medicaid waiver services

and there are a number of companies from which the waiver participant may choose. PCA providers are required to provide Worker's Compensation and Unemployment befits to caregivers.

129.  The Laurens DSN Board does not provide waiver participants with a list of respite providers and the waiver participant must locate his own potential respite workers. Respite workers are not paid through the waiver until they receive training from the local DSN Board. This training is scheduled as determined by the DSN Board and respite caregivers are not paid to attend this training, but employees of DDSN Regional Centers are paid to attend mandatory training.

130.  Until recently, the DSN Boards did not pay fica taxes on salaries paid to respite workers, requiring them to pay both the employer's share and the employee share. Salaries paid to respite workers are lower than those paid to caregivers working in congregate SCDDSN facilities.

131.  Defendants have not informed waiver participants that no liability coverage is provided for respite workers or that respite workers injured on the job have been instructed to file liability, Worker's Compensation or Unemployment claims against the waiver participant and/or his family.

132.  According to SCDDSN, neither the local DSN board or the state agency have responsibility for injury caused by a respite caregiver, even intentional injury, because SCDDSN claims that respite caregivers are independent contractors or that they are employees of the family.

133.  Defendants do not require local DSN Boards to provide Worker's Compensation or Unemployment benefits to respite workers, although these benefits, along with annual

24

and sick leave and health insurance, are provided to caregivers working in congregate SCDDSN facilities.

134.    Defendants never informed Chip about the availability of adult companion services as a feasible alternative or Medicaid funded assistive communications services and equipment which would allow him to communicate with others using an augmentative communications device.

135.    Plans of care are prepared by service coordinators. Most service coordinators work for local DSN Boards, however, a SCDDSN has included a few private providers of service coordination services on its QPL (Qualified Provider List).

136.    The Medicaid Act requires Defendants to provide all Medicaid covered services which are medically necessary and are contained in the plan of care.

137.    Defendants failed to explain to Chip that he has the right to choose a service coordinator who is not employed by the Laurens County DSN Board and he was never informed of all "feasible alternatives" under the waiver program and when Chip chose an independent service coordinator, DDSN terminated that person as a provider.

138.    When Chip attempted to exercise his right of choice of service coordinators under 42 U.S.C. §1396a(a)(23), DDSN "froze" her from accepting new clients and later terminated her contract as a provider under the MR/RD Medicaid waiver.

139.    **Michelle M.** is a 37 year old citizen of South Carolina who resides in Clinton, South Carolina, where she lives in the home of her aging parents.

140.    Michelle has profound mental retardation, autism, severe physical disabilities, including a severe seizure disorder and Parkinson's disease. She as been diagnosed as

having reflux and a sleep disorder. Michelle has an IQ of 15 and an adaptive score of a two year old child. She is non-verbal and receives nutrition and medications through a gastrostomy tube and is incontinent of bowel and bladder.

141.    Michelle is a beautiful, delicate woman who looks much younger than her age. She weighs 135 pounds now, but when Michelle lived in an institution, her weight dropped below 80 pounds.

142.    Prior to the changes in the MR/RD Medicaid waiver program which went into effect on January 1, 2010, Michelle received 8 hours a day of personal care attendant services at home and 28 hours a week of respite services. Defendants reduced Michelle's authorization for personal care attendant services to 4 hours a day because of the limitations which went into place on January 1, 2010.  Michelle's services are being continued pending her administrative appeal.  Michelle will require immediate institutionalization in the event that her services are reduced.

143.    Michelle's parents want to keep her at home and do not want to have to return her to a Regional Center operated by the State, where she would be isolated from her friends and family.

144.    Michelle was a "normal" child until she was four months old. Her parents were awakened one night to a "horrifying" scream and Michelle began convulsing. Her brain was damaged due to a grand mal seizure and she lost the ability to speak.

145.    Michelle was six years old before she learned to walk, a skill that has been largely lost as she has aged. Now she walks only with hands-on assistance. She has to be watched constantly because she is at risk of falling.

146.    Michelle sometimes pulls out her gastronomy tube when she attempts to get out of

her geri-chair. Without one-on-one supervision she receives at home, Michelle would have to be tied to her chair with a seat belt.

147. Such restraint would increase her anxiety level and would likely lead to a deterioration in her mental health.

148. After her mother suffered a stroke, Michelle was admitted at age 15 to Whitten Center, a large ICF/MR (Intermediate Care Facility/Mental Retardation) Regional Center operated by the State of South Carolina.

149. Michelle was institutionalized at the Regional Center because her parents could no longer afford to pay for her care at home without additional supports.

150. Michelle received many "unexplained" injuries while living at Whitten Center. Her teeth were knocked out when Michelle "fell" and she has scars on her neck and side from being "clawed." Her finger was broken and her parents were not provided with a logical explanation for the injury. When Michelle's toe was broken, her parents found nail prints from someone's hand on her foot.

151. The United States Department of Justice initiated an investigation at Whitten Center in 1994 after receiving reports of residents being left unattended and sitting in their own urine and feces for hours and ten unexplained resident deaths.

152. Michelle's parents were not informed of these investigations which were being conducted by the Department of Justice, but they received a call from Whitten Center officials around 9:00 p.m. one night, asking that they remove Michelle from the facility immediately.

153. Whitten Center staff told her parents that Michelle was "grieving." They told her parents that Michelle was not eating and she was not adjusting well to living at

27

Whitten Center. SCDDSN asked her parents to take Michelle home, offering them incentives of promises of attendant care, respite and a stipend to remove Michelle from the ICF/MR Regional Center.

154.    Michelle returned home in 1995 under the "What Will It Take Family Support Program."

155.    Under this program, SCDDSN promised Michelle's parents that they would provide all needed supplies and services which she had received in the Regional Center. SCDDSN also promised her parents that they would pay for personal care services and that respite services would be provided two weeks a year and every other weekend, to give them a break from their caregiving duties.

156.    Also through the "What Will It Take" program, in return for Michelle giving up her right to receive services in the Regional Center, SCDDSN promised to pay Michelle's parents a $525 per month stipend to help provide for Michelle's care at home.

157.    Michelle's mother experienced another stroke after Michelle returned home. Her father has congestive heart failure and atrial fibrillation, which has been aggravated due to the stress of the ongoing threats to reduce or eliminate Michelle's services.

158.    Michelle's mother must be present in the home when Michelle eats (receiving nutrition through a tube in her stomach). Her mother has to be at home to administer Michelle's medicine at 8 a.m., 1:30 p.m., 7 p.m., 10 p.m., 11 pm and midnight. Pursuant to SCDDSN policy, Michelle's personal care attendant and respite caregiver are not allowed to perform these services. SCDDSN requires that her mother be present at each feeding and medication administration. This severely limits her

28

mother's ability to take care of her own personal needs.

159.   The 8 hours a day of personal care services Michelle receives at home have allowed her to remain in the least restrictive setting appropriate to meet her needs. These services provide someone to help Michelle's mother to bathe, dress and toilet her. They allow her parents to attend to their own medical appointments and to run errands, like shopping for groceries, in between Michelle's feedings.

160.   Michelle's mother sleeps in a recliner in her room at night, because Michelle requires constant monitoring during the night due to her seizure disorder.

161.   Michelle was receiving "daily respite" services at home, which cost $70.00 per day. These services were eliminated with the January 1, 2010 amendments and this service was replaced with ICF/MR respite services costing $270.00 per day.

162.   The last week of December 2009, SCDDSN called Michelle's parents and informed them that, in addition to reducing Michelle's personal care attendant services from eight hours a day to four hours a day, their $525 stipend, which DDSN paid Michelle's parents for fifteen years, would be terminated "immediately."

163.   The Defendants failed to provide a written notice containing the reasons for the reductions and the regulation or statute authorizing the reduction.

164.   After an article appeared on New Year's Day, 2010, in the Greenville News about the termination of Michelle's stipend, SCDDSN officials called Michelle's parents that same day reversing its decision to eliminate her $525 per month stipend. SCDDSN officials informed her parents that afternoon that the stipend promised through the "What Will It Take" program would continue but her PCA services would still be reduced.

165.  On January 1, 2010, SCDDSN reduced Michelle's personal care attendant services from eight hours a day to four hours a day due to claims of "budget reductions," without citing a regulatory or statutory basis.  These services are now being provided pending an administrative appeal to the South Carolina Administrative Law Court.

166.  Michelle filed an appeal with SCDDSN requesting a fair hearing in January, when SCDDSN notified her parents that her personal care attendant services were being reduced to 28 hours, but Defendants have not provided her with a fair hearing as required by 42 U.S.C. § 1396a(a)(3).

167.  Dr. Buscemi upheld the reduction in PCA services based on the caps approved effective January 1, 2010 without even performing an assessment to determine whether Michelle was entitled to the maximum number of respite hours allowed under the new cap.

168.  After Michelle filed this appeal, the local DSN board at first informed Michelle's mother that she would receive the maximum respite hours, but these hours have never been provided.

169.  Michelle's parents have both required hospitalizations due to their own deteriorating health.  Without increased respite services, they will be unable to maintain the level of supervision and care Michelle needs at home in the event that either of them requires a hospital stay.  They will have no option but to place her at a more restrictive, more expensive Regional Center for respite if her personal care attendant services are reduced and adequate in-home respite services are not provided.

170.  Despite being informed that SCDDSN would provide the "maximum" number of respite hours (240 per month), Michelle's respite hours were only increased by 2

hours a week, to 30 hours a week.

171.　When Dr. Buscemi upheld the agency decision to reduce Michelle's hours, she filed an appeal with SCDHHS.

172.　Instead of providing a fair hearing, the hearing officer issued an "Interlocutory Order" requiring Michelle to provide proof of an error by SCDHHS.

173.　When Michelle responded to this Order, the hearing officer dismissed her appeal without providing an opportunity for discovery or a fair hearing.

174.　When they took Michelle out of the ICF/MR, Michelle's parents relied in good faith upon SCDDSN's promises that they would provide 48 hours of respite services a week, in addition to two additional weeks of respite a year.  This promise has been broken, placing Michelle at immediate risk of institutionalization.

175.　The decision to limit Michelle's personal care attendant hours to 28 hours a week and to provide only 30 hours a week of respite was made without contacting her treating physician or considering his opinions regarding her need for waiver services.

176.　Michelle did not receive in a timely fashion the specialized sponges she needs to avoid infection of her stoma site, where stomach acid leaks out and irritates her skin.  Michelle did not receive notice or an explanation of this termination of supplies which are necessary to maintain her health at home.  These supplies would be provided if Michelle's elected to exercise her right to receive more costly ICF/MR services.

177.　Defendants have violated the integration mandate of the ADA and Section 504 by failing to provide services and supports which would be available to Michelle, at significantly greater cost, if she were to exercise her right to receive services in an

31

ICF/MR.

178.    Michelle's parents will not have the stamina to feed, bathe, toilet and dress her if her personal care attendant services are reduced. Furthermore, they will be unable to sleep or to leave the house to take care of their own physical and medical needs. Michelle will be at significant and immediate risk of returning to an ICF/MR. She would be isolated from her family and her community.

179.    Michelle's care can be provided in the home with reasonable modifications at a cost that is less than the cost of ICF/MR services.

180.    Michelle is entitled to receive services in her own community, with great deference provided to the medical decisions of her responsible, treating physicians.  *Olmstead v. L.C.*, 527 U.S. 581 (1999).

181.    Michelle is at immediate risk of institutionalization if an injunction is not issued by this Court.

## FACTUAL BACKGROUND

**A.    How MR/RD Medicaid waiver services are delivered in South Carolina.**

182.    Before 1981, the only residential services provided by SCDDSN that the federal government would pay for were provided in institutional ICF/MR settings. (Intermediate Care Facilities/Mental Retardation are highly regulated nursing facilities for persons who have mental retardation or a related disability. Most of these services were operated by SCDDSN Regional Centers, like Whitten Center.

183.    In 1981, Congress authorized the federal Medicaid Agency, CMS (formerly the United States Department of Health Care Finance Administration, or HCFA), to pay for services in individuals' homes or other less restrictive settings outside of

traditional institutional facilities. In South Carolina, these services are provided in individuals' own homes, in group homes where four or fewer persons live together called Community Training Homes II ("CTH II"), in foster homes (Community Training Home I or "CTH I") and in supervised apartment settings (Supervised Living Programs or "SLP").

184.   In 1999, the United States Supreme Court upheld the right of persons with disabilities to receive services in the least restrictive setting where they are fully integrated into the community. *Olmstead, supra.* On the tenth anniversary of this decision, President Obama and U.S. Secretary of Health and Human Services, Nancy Sebelius, declared 2009 the "Year of Community Living," thereby affirming the goal of the Americans with Disabilities Act that people who have disabilities have meaningful choices to live and participate in the community.

185.   2010 was the 20th anniversary of the Americans with Disabilities Act. This Act has been called the "most sweeping civil rights legislation since the Civil Rights Act of 1964." Congressman Jerrold Nadler (D-NY), Chair of the House Judiciary Subcommittee on the Constitution, Civil Rights and Civil Liberties.

186.   Despite these commitments of the federal government to integrate persons who have disabilities into the mainstream of community living, South Carolina continues to divert a significant portion of its resources to maintaining the monopoly of SCDDSN and its system of local DSN Boards and to commit resources to providing services and infrastructure in the most segregated settings, ICF/MR facilities and, in particular, the Regional Centers.

187.   Medicaid home and community based waiver programs allow states to waive only

three Medicaid requirements: state-wideness, comparability of services, and community income and resource rules. States must comply with all other requirements of the Medicaid Act. States may elect to cover a limited number of individuals in a waiver program, may offer different groups different sets of services, may offer the services in only certain geographic locations, or may waive income deeming requirements so as to allow more individuals to be Medicaid eligible. Unless a specific Medicaid requirement is waived by CMS, the State must comply with all other Medicaid rules, regulations and statutes.

188.     The federal agency that is responsible for all Medicaid programs is CMS, the "Centers for Medicare and Medicaid Services." CMS provides SCDHHS with the federal matching funds for waiver programs.

189.     SCDHHS contracts with SCDDSN to operate the MR/RD Medicaid waiver program. SCDDSN is governed by a seven member Commission appointed by the Governor and subject to removal by the Governor.

190.     SCDDSN in turn contracts with local DSN Boards, which are paid prospectively for services on a "capitated" basis.  Private providers of the services that were reduced or eliminated on January 1, 2010, on the other hand, must provide the services then wait for payment on a fee-for-service basis.

191.     In most counties, DSN Boards are quasi-governmental agencies which plan and coordinate SCDDSN services in the county. In a few counties, such as Spartanburg, SCDDSN contracts with a private corporation, which is treated with preference as if it were a DSN Board, even though a legitimately appointed DSN Board exists in the County.

192.   Private and faith-based providers must compete to provide waiver services, but DSN Boards and the Charles Lea Center are paid a capitated rate prospectively while other private providers must provide the service, then bill the local Board for reimbursement.

193.   DDSN allows the Charles Lea Center to provide both service coordination and direct waiver services, but it prohibits other private entities from providing both types of services.

194.   Local DSN Boards and private corporations given preference like a DSN Board have a financial incentive to deny services, because they can spend a waiver participant's "unspent" capitated payments as they choose.

**B.     Plaintiffs have relied in good faith on the promises of the State to provide services in the community and federal entitlements to receive services in the least restrictive setting.**

195.   SCDDSN began a major push during the mid-1990's to reduce the population at the Regional Centers by moving residents back to their homes and to less expensive alternative community placements. SCDDSN aggressively sought out families willing to accept the responsibility of taking their adult children back into their homes or moving their adult children into a more restrictive setting  in order to depopulate the SCDDSN Regional Centers and other ICF/MR facilities.  This was done by promising families extensive community services and supports. These families acted in good faith relying on the promises made by the State.

196.   SCDDSN called the program "Whatever it Takes." They enticed families to move their loved ones out of ICF/MR placements in Regional Centers by promising that the

state would provide necessary services and supports in the community through the MR/RD Medicaid waiver program. Some parents were also promised stipends and other financial assistance for providing care in their homes for adult children who had been placed years before in state institutions. The State promised to do "whatever it takes" to move these individuals out of the institutions and into home and community based settings.

197.    Another major cost-reduction plan was introduced by SCDDSN in 1998. Prior to that time, providers of waiver services billed Medicaid for each waiver service they provided, only after that specific service was provided. In 1998, SCDDSN began a three year conversion from this fee-for-service system to a managed care system, where local DSN Boards would be paid a "band" payment before services were delivered. The amount of each waiver participant's band is based on where the individual lives, rather than being based on the waiver participant's needs. A significantly lower band amount is provided for people who live at home, like Chip E. and Michelle M., or in a supervised apartment, like Peter B., regardless of the severity of their condition or their need for supervision and support.

198.    When this managed care system was implemented, SCDDSN repeatedly assured families and consumers, in writing and in public meetings, that they would continue to receive  the services and supports they were receiving on July 1, 1998, regardless of any subsequent needs assessment.  SCDDSN provided assurances and promises that services provided on July 1, 1998 would be continued and not reduced, "if that was the choice" of the consumer and his/her family.

199.    In reliance on promises of extensive community supports made by SCDDSN, Peter

B. and Michelle M. gave up their ICF/MR placements to move into community settings. They were assured that waiver services would be provided in the amount, duration and scope necessary to meet the purposes of the MR/RD Medicaid waiver program, i.e. to maintain the health and welfare of waiver participants and to provide all services that are necessary to avoid or delay institutionalization. 42 U.S.C. § 441.302. These Plaintiffs were assured that their services would not be reduced below the level provided on July 1, 1998 and they relied to their detriment on these promises.

C.    **Despite a national trend away from institutional services, South Carolina has violated the civil rights of the Plaintiffs by continuing to dedicate a disproportionate amount of the State's resources to protect and maintain services in institutional or congregate settings.**

200.   Despite the large numbers of ICF/MR participants opting to move out of SCDDSN Regional Centers over the years in reliance on SCDDSN's promises to provide and continue providing home and community supports, the proportional spending for services in these Regional Centers remains high. Although DDSN consumers living in Regional Centers account for less than 3% of the persons currently served by SCDDSN, in recent years the cost of operating the Regional Centers accounts for approximately 18% of the agency's annual expenditures. The proportional spending for the Regional Center is likely to be higher this year for the Regional Centers since there will be little movement subsequent to SCDDSN's reduction of home based services (in February, SCDDSN notified waiver participants living at home that it was considering terminating *all* home based waiver services, retaining only the residential services funded by the waiver).

37

201.   Prior to implementation of the January 1, 2010 amendments, SCDDSN estimated that only 30 individuals would have to resort to using ICF/MR facilities to provide respite services, according to the waiver document for the year ending in 2009.

202.   SCDDSN reported that it expected this number to increase to 126 individuals having to resort to use ICF/MR respite services during the year beginning January 1, 2010.

203.    Before these amendments went into effect on January 1, 2010, waiver participants averaged 22 days in ICF/MR respite facilities.  With the recent waiver amendments, Defendants' own estimates are that the average user would spend 33 days in institutional respite, a 50% increase in the number of respite days spent in an institution.

204.   Despite claims that these waiver amendments were necessary because of major reductions in funding, Defendants also increased the reimbursement rate paid to SCDDSN and its local DSN Boards for ICF/MR respite services from $157.50 per day to $270.00 per day for 2010.

205.   SCDDSN reported that $103,808.00 would be spent for respite services provided in ICF/MR facilities during 2009, however, institutional respite services were reported to cost $1,122,660.00 during 2010, a more than ten fold increase.

206.   After informing Commissioners and the public that waiver services had to be reduced because of a $4.6 million deficit at SCDDSN, within the month of the Commissioners voting on these reductions, the Interim Director of SCDDSN wrote to the Budget and Control Board asking for permission to spend a previously undisclosed "reserve" account which contained more than $7 million.

207.   $2.8 million of those "reserve"funds were paid to three local DSN Boards to purchase

large congregate workshops which had not been included in the agency's capital funding plan approved just months earlier and were not included in the budget approved by the General Assembly in May 2009.

208. Contrary to the national trend, South Carolina has continued to expend significant resources providing services and infrastructure in the most expensive congregate, institutional facilities, where persons who have disabilities are stigmatized and isolated from their families, their friends and their communities.

209. SCDDSN continues to expend a large portion of its budget on services provided in ICF/MR (Intermediate Care Facility/Mental Retardation) facilities, which are highly regulated and isolated nursing facilities for persons who have mental retardation and related disabilities.

210. The reductions to the MR/RD Medicaid program were made without legislative review or approval and without conducting an economic or medical study to consider whether these reductions are consistent with efficiency, economy, quality of care and access to services.  42 U.S.C. § 1396a(a)(30).

211. Defendants submitted and obtained approval for these changes without performing any economic analysis of the effect these reductions would have on prevention measures, as is required by South Carolina Code of Laws § 44-6-70.

212. Likewise, DDSN did not perform a study of the effect these changes would have on the delivery of services by non-DSN Board providers (freedom of choice required by 42 U.S.C. § 1396a(a)(23).

213. Reductions to services provided to Plaintiffs by Defendants put these individuals with disabilities, who have successfully resided in the community for many years, at

39

imminent risk of institutionalization, in clear violation of Title II of the Americans with Disabilities Act, Section 504 and the Medicaid Act.

214. Defendants have discriminated against persons who have the most severe disabilities by allocating funding based on where the individual lives rather than basing funding on the severity of the participant's disability and their need for support to remain in the community.

215. SCDDSN provides greater funding to persons who live in the most restrictive segregated settings, the SCDDSN Regional Centers instead of allocating funding with an even hand and it fails to base funding on the individual medical needs of the waiver participant in light of the needs of all persons served by the South Carolina Department of Disabilities and Special Needs (SCDDSN).

216. Defendants have based the allocation of waiver services on decisions made by bureaucrats and these decisions are being made in a vacuum without considering the opinions of treating physicians or other qualified treating medical sources.

217. Defendants have reduced or failed to provide medically necessary services which are needed to assure the health and welfare of Medicaid waiver participants, as is required by the Medicaid Act.

218. SCDDSN has adopted a written policy that the "money follows the person" on paper. According to this policy, when a waiver participant moves from an institutional setting or another restrictive setting to a less restrictive setting in the community, the individual's funding provided in the institution is supposed to follow him.

219. However, in practice, when an individual moves from a facility operated by SCDDSN or one of its local DSN Boards to a less restrictive setting in the

community, SCDDSN drastically reduces available funding, regardless of whether the persons' needs can be safely met at the reduced funding level.

220. The result of these practices is that the State has diverted a disproportionate amount of its resources to maintaining the monopoly of SCDDSN congregate facility providers (including local DSN Boards), thereby violating the choice of providers of waiver participants in violation of 42 U.S.C. § 1396a(a)(23).

221. Defendants have jeopardized the ability of waiver participants to live and work in the community by placing them at risk of institutionalization in order to receive the services they need.

222. Amendments implemented on January 1, 2010 eliminated speech and language, physical therapy and occupational therapy services from the MR/RD Medicaid waiver program (Mental Retardation/Related Disability). These services would be provided if the waiver participant moved to an ICF/MR facility, at a greater cost to the Sate.

223. Defendants established limitations on personal care attendant and adult companion services at 28 hours a week (combined for both services).

224. The option of daily home-based respite was eliminated and participants are now restricted to receiving 68 hours of respite per month in their own homes (with a maximum cap of 240 hours a month in the home only if a temporary exception is granted by SCDDSN).

225. Nursing hours were limited to 56 hours of LPN or 42 hours of RN.

226. These caps are arbitrary and are unrelated to the medical needs of waiver participants or the cost that the State would incur if institutional services were provided. Arbitrary

41

caps were placed on the cost of wheelchairs and other supports (diapers, wipes and nutritional supplies) which people who have disabilities need to remain at home.

227.  SCDDSN has informed Plaintiffs that their home and community based Medicaid waiver services will likely soon be further reduced, or may perhaps even be totally eliminated, while increasing expenditures at Regional Center and ICF/MR facilities.

228.  Defendants have acted in concert to deny plaintiffs of a fair hearing and SCDHHS regularly dismisses the fair hearing appeals filed by waiver participants in violation of Plaintiffs' constitutional due process rights and 42 U.S.C. § 1396a(a)(3) of the Medicaid Act.

229.  The United States Supreme Court in *Olmstead v. L.C. ex rel. Zimrig*, 527 U.S. 581 (1999), has determined that unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA. In that case, the Supreme Court interpreted the ADA's "integration mandate" as requiring persons with disabilities to be served in the community when: (1) the state determines that community-based treatment is appropriate; (2) the individual does not oppose community placement; and (3) community placement can be reasonably accommodated without fundamentally altering the nature of the State's programs. Id. at 607.

230.  Most personal care, attendant and nursing services are provided by private providers, not DSN Boards or SCDDSN.

231.  Respite services are provided at a significantly lesser rate than that paid to personal care attendants and respite workers do not receive the benefits SCDDSN provides to caregivers working in Regional Centers.

42

232.    The changes that went into effect on January 1, 2010 were intended to limit waiver participants' choice of providers and to continue the monopoly of SCDDSN and local DSN Board providers.

233.    According to SCDDSN, all of its beds are full.  If Plaintiffs attempted to exercise their right to receive ICF/MR services in order to insure their health and safety in the event that their waiver services are reduced, it is unlikely that this request would be honored. They would instead be placed on a waiting list.  Many individuals have been on the SCDDSN residential waiting lists for more than fifteen years.

234.    Because of arbitrary caps Defendants have placed on Medicaid waiver services, many persons with disabilities who would like to move from hospitals and other institutions are prevented from doing so, even though the cost of services in the community would be far less expensive than their cost of care in an institution.

235.    SCDDSN has reported that no residential beds are currently available in its system, and it is not uncommon for waiver participants to have to wait for many years for a residential bed in a group home or other less restrictive setting.  Some waiver participants have spent years in ICF/MR respite services because of the failure to provide adequate supports in the community.

236.    A report released by South Carolina Protection and Advocacy for People with Disabilities, Inc. in 2005 titled "Unequal Justice for South Carolinians," documented that even though significantly more is spent on congregate services in SCDDSN facilities, Defendants have failed to protect the health and welfare of persons living in these more restrictive facilities.  Plaintiffs are being forced to enter these SCDDSN funded residential programs by Defendants' denial of home-based services.

43

237.   Defendants caused an amount equal to 90% of the federal stimulus funds paid to
       SCDDSN in FY 2009 to be transferred to a rainy day fund, instead of using these
       funds to maintain home-based waiver services.

238.   At the end of FY 2010, this rainy day fund should have contained more than $195
       million. By law, these funds must be used to provide "health care."

239.   According to the Defendants, these funds are state dollars, not federal dollars. If that
       is correct, if these funds were used to provide Medicaid services, South Carolina
       would be entitled to receive matching federal funds in excess of $700 million.

240.   Limits were imposed by the Defendants on nursing services and the cost of
       wheelchairs. Defendants also imposed arbitrary limits on the number of diapers and
       nutritional supplements waiver participants could receive.

241.   Defendants totally eliminated Plaintiffs' access to speech and language services,
       physical therapy and occupational therapy from the MR/RD Medicaid waiver
       program. Defendants enacted the reductions in speech and language services without
       studying the risks and benefits of eliminating those services, including the number of
       deaths and injuries due to choking or swallowing disorders.

242.   Elimination of speech and language services effectively terminated waiver
       participants' access to assistive communications devices, since an assessment by a
       qualified speech therapist is required in order to receive a prescription for an assistive
       communications device.

243.   As a result, persons who have speech disorders will not be able to communicate with
       their caregivers, their families or people in their communities.

244.   Although Plaintiffs were not receiving physical therapy or occupational therapy

44

services, their option to receive these services in the future was eliminated with the changes that went into effect on January 1, 2010.

245.    These changes were made without conducting any cost analysis to determine whether the changes would reduce, or increase, the cost of the home and community based waiver programs. Defendants did not consider whether such reductions are consistent with efficiency, economy, quality of care and access to services, considerations required by  42 U.S.C. § 1396a(a)(30).  Defendants made no study of whether these reductions would assure the cost-effective delivery of services or the effect these reductions would have on prevention measures, as is required by South Carolina Code of Laws § 44-6-70.

246.    No study was made of the medical consequences which would occur when these services were reduced or eliminated and whether the health and welfare of waiver participants would be jeopardized by reducing these services. No public input was requested before SCDHHS approved these reductions in May 2009.  An "after the fact" public hearing was held in June.

247.    Defendants Keck, Buscemi, Floyd and Huntress have acted in concert under color of law to deprive Plaintiffs of rights and privileges secured by the laws of the United States and have failed to provide reasonable modifications to the State's programs to protect the rights of Plaintiffs guaranteed under the ADA, Section 504. 42 U.S.C. § 1983.

## COUNT ONE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

248.　 In Count One, the term "Defendants" refers to Anthony Keck, Beverly Buscemi, Kelley Floyd, Richard Huntress, SCDHHS and SCDDSN.

249.　Plaintiffs adopt and restate the allegations set forth above in this complaint.

250.　It is undisputed that Plaintiffs are qualified individuals with disabilities who have physical and/or mental impairments that substantially limit one or more of their major life activities, including, but not limited to one of more of the following: thinking, walking, communicating, learning, working, caring for themselves and concentrating. See 42 U.S.C. § 12102.

251.　Public entities, like the South Carolina Department of Health and Human Services and the South Carolina Department of Disabilities and Special Needs, are required by federal law to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, except where the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 CFR § 35.130(b)(7) (1998).

252.　The South Carolina Department of Health and Human Services, the South Carolina Department of Disabilities and Special Needs are public entities.

253.　The State's treating professionals have determined that community-based treatment is appropriate; the Plaintiffs do not oppose community placement and their needs can be reasonably accommodated without fundamentally altering the nature of how the State delivers services.

254.    Under the "integration mandate" of Title II Of the ADA and Section 504 of the Rehabilitation Act, Defendants must administer long-term care services in a manner that provides services to individuals who have disabilities in the most integrated setting appropriate to their needs.

255.    The actions taken by Defendants discriminate against persons with the greatest needs who have remained or returned to the community in good faith reliance on promises of services and supports provided by SCDDSN; they oppose living and spending their days in workshops or congregate residential settings where they will be isolated from the community, their families and friends.

256.    The isolation and segregation of individuals with disabilities is a serious and pervasive form of discrimination in South Carolina and the State's unjustified placement of these persons in institutional workshops and residential congregate programs severely limits their exposure to the outside community, constituting a form of discrimination based on disability which is prohibited by Title II. 42 U.S.C. § 12101(a)(2), (5).

257.    The State's unjustified placement of these persons in institutional day and residential congregate programs severely limits their exposure to the outside community, constituting a form of discrimination based on disability which is prohibited by Title II, 42 U.S.C. § 12101(a)92), (5).

258.    Institutional placement of persons who benefit from being integrated into the community  perpetuates unwarranted assumptions that the persons so isolated are incapable or unworthy of participating in community life.  Institutional confinement in congregate day and residential facilities severely diminishes individuals' everyday

life activities,  including family relations, social contacts, work options, economic

independence, educational advancement, and cultural enrichment.

259.    Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified

individual with a disability shall, by reason of the disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a

public entity or be subject to discrimination by such entity." 42 U.S.C. § 12132.

260.    The ADA and its implementing regulations found at 28 C.F.R § 35.130(d) require the

States to administer services, programs and activities in "the most integrated setting

appropriate" to the needs of qualified individuals with disabilities. This integration

mandate is not limited to residential programs, but covers all services and programs

where persons with disabilities and discriminated against because of their disability.

261.    Under changes made by SCDHHS and SCDDSN to the home and community based

waiver programs operated by SCDDSN, persons with mental disabilities are being

forced, because of their disabilities, to relinquish their right to participate in

community life, which they could enjoy given reasonable accommodations, at less

cost than congregate services SCDDSN attempts to impose upon the Plaintiffs.

262.    Reductions in home and community based services by the Defendants constitute

discrimination against persons who have disabilities, who, unlike persons who have

less severe disabilities, are unable to have their needs met in their homes and

communities under the arbitrary limitations established by the Defendants.

263.    The services Plaintiffs request are clearly not unreasonable, given the demands on the

State's health care budget and the resources available to pay for these services,

because the services Plaintiffs request cost less than placement in a SCDDSN

48

Regional Center.

264.    The United States Supreme Court in *Olmstead v. L.C. ex rel. Zimrig*, 527 U.S. 581
(1999), held that unnecessary institutionalization of individuals with disabilities is a
form of discrimination under Title II of the ADA. In doing so, the Supreme Court
interpreted the ADA's "integration mandate" as requiring persons with disabilities to
be served in the community when: (1) the state determines that community-based
treatment is appropriate; (2) the individual does not oppose community placement;
and (3) community placement can be reasonably accommodated. Id. at 607.

265.    The Plaintiffs' needs can be reasonably accommodated, as has been demonstrated
by their continuous care in the community for many years.

266.    Providing the services Plaintiffs request would not place an unreasonable burden
on the State nor would it force the state to fundamentally alter the nature of its
programs.

267.    Services requested by Plaintiffs can be provided without undue burden to the
state, taking into consideration its obligation to provide health care and services
with an "even hand."

268.    Defendants have failed to make reasonable modifications to the home and
community based waiver programs operated by SCDDSN, which are necessary
for Plaintiffs to remain in the least restrictive setting. The failure to maintain
services to allow Plaintiffs to remain in their integrated home and community
based settings constitutes unlawful discrimination in violation of Title II of the
ADA and its implementing regulations at 28 C.F.R. § 35.130(d).

269.    Defendants have failed to exercise their discretion in a non-discriminatory

49

manner, denying Plaintiffs necessary funds used to provide home and community based services they require to remain in the least restrictive setting.

270. Plaintiffs request an order finding that Defendants have violated the Americans with Disabilities Act by operating its service delivery system to maintain segregated congregate facilities and to promote the economic health of the local DSN Boards and SCDDSN.

271. Plaintiffs request an award of fees, costs and expenses and such other relief as this Court shall determine to be just.

**COUNT TWO**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**

272. In Count Two, the term "Defendants" refer to Anthony Keck, Beverly Buscemi, Kelly Floyd, Richard Huntress, SCDHHS and SCDDSN.

273. Plaintiffs adopt and restate the allegations set forth above in this complaint.

274. Section 504 of the Rehabilitation Act of 1973 provides, "no otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

275. "Program or activity' includes a department, agency, special purpose district, or other instrumentality of a State or local Government. 29 U.S.C. § 794(b)(1)(A).

276. "Recipient" of federal financial assistance also includes any public or private agency or other entity to which Federal financial assistance is extended directly or through another recipient. 28 C.F.R. § 41.3(d).

277.  Regulations implementing Section 504 require a recipient of federal financial assistance to administer its services, programs, and activities in the "most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

278.  Defendants receive federal financial assistance under Section 504 and its implementing regulations. Federal Medicaid funds account for nearly 80% of the cost of the home and community based waiver programs administered by SCDDSN.

279.  Defendants and their contracting agencies and organizations are recipients of Federal financial assistance under Section 504 and its implementing regulations.

280.  Plaintiffs are "qualified persons with disabilities" within the meaning of Section 504 because they have physical and/or mental impairments that substantially limit one or more major life activities, and they meet the essential eligibility requirements for the home and community based waiver programs administered by SCDDSN. See 29 U.S.C. § 705(9).

281.  Defendants have failed to make funds available, up to the cost of ICF/MR services, thereby preventing Plaintiffs access to services they need to remain out of congregate facilities such as workshops and segregated residential homes funded by SCDDSN.

282.  Defendants have failed to make reasonable modifications to home and community based waiver programs to allow Plaintiffs to utilize waiver services so that they can successfully maintain their placement in the least restrictive setting appropriate to their needs.

283.  Defendants' actions stigmatize the Plaintiffs and jeopardize the Plaintiffs' ability to remain integrated into the communities in their own homes or apartments.

284.   Failure to provide services in the least restrictive setting appropriate to the needs of waiver participants constitutes unlawful segregation in violation of Section 504 of the Rehabilitation Act and its implementing regulations at 28 C.F.R. 42.51(d).

285.   Defendants have also utilized criteria and methods of administration that subject Plaintiffs to discrimination on the basis of disability, including risk of unnecessary institutionalization, by (1) failing to assess properly the services and supports that would enable Plaintiffs to remain in the community, (2) failing to ensure that Plaintiffs have access to Medicaid-covered services that will meet their needs in the community, and (3) compelling health care providers to reduce recommended levels of in home nursing and community based services, thereby violating Section 504 and its implementing regulations.

286.   Plaintiffs request an award of fees, costs and expenses and such other relief as this Court shall determine to be just.

## COUNT THREE
## VIOLATION OF THE MEDICAID ACT

287.   In Count Three, the term "Defendants" refers to all named individual and agency defendants, except where allegations are specifically limited to the individuals named in a particular paragraph.

288.   Plaintiffs adopt and restate the allegations set forth in the paragraphs above.

289.   Plaintiffs are at immediate risk of institutionalization if an injunction is not issued by this Court requiring Defendants to comply with the Medicaid Act

290.   Defendants Sanford, Haley, Keck and Buscemi have acted in concert with one another and others to violate Plaintiffs constitutional due process right to a fair

hearing required by 42 C.F.R. § 431 et seq.

291. Defendant Keck has not required DHHS to comply with the fair hearing regulations since he was appointed by Governor Nikki Haley as Director of DHHS in January 2011 and he has failed to protect the due process rights of Plaintiffs.

292. Defendants violated Plaintiffs' rights under 42 C.F.R. § 431.210 by failing to provide notice complying with the clear mandates of that section by failing to provide legitimate reasons for attempting to reduce services and by failing to cite the specific regulations supporting the reduction of MR/RD Medicaid waiver services.

293. Acting under color of law, the individual Defendants named in this Complaint have deprived Plaintiffs of services to which they are entitled as a result of their disabilities.

294. Defendants have violated the Medicaid Act by failing to provide comparable Medicaid services to individuals with severe disabilities as are available to the general public, failing to provide MR/RD Medicaid waiver services in sufficient amount, duration and scope to prevent the Plaintiffs from moving to a more restrictive setting, failing to implement and employ reasonable standards; failing to provide services with reasonable promptness, failing to provide services from the participant's choice of providers; failing to inform waiver participants of all feasible alternatives under the waiver and failing to assure that the health and welfare of waiver participants is protected.

295. Defendants have violated the Medicaid Act by promoting the monopoly of the local DSN Boards and those private corporations which SCDDSN has historically treated as local DSN Boards, thereby reducing Plaintiffs' freedom of choice of providers. 42

U.S.C. § 1396a(a)(23).

296.    These actions have violated Plaintiffs' rights under 42 U.S.C. §§ 1396a(a)(3) (due

process), 1396a(a)(8) (reasonable promptness); 1396a(a)(10) (sufficiency);

1396a(a)(17) (reasonable standards); 1396a(a)(23) (choice of provider); 1396a(a)(30)

(equal access and adequate payment rates) and 42 C.F.R. § 441.302 (assurance of

protecting health and welfare and financial accountability).

297.    Through their actions, the individual Defendants have violated the Supremacy Clause

of the United States Constitution by implementing state policies which conflict with

the clear requirements of the Medicaid Act.

298.    Actions taken by the Defendants proximately caused injury to Plaintiffs by denying

services which have been promised by SCDDSN which are needed to remain in the

least restrictive setting, i.e. their homes and communities.

299.    Instead, Defendants may have spent funds intended to provide these services in

disregard of the federal mandates contained in the Medicaid Act without regard for

the consequences to the intended beneficiaries.

300.    Plaintiffs request declaratory and injunctive relief finding that Defendants have

violated the Medicaid Act as set forth herein.

301.    Plaintiffs request payment of fees, costs and expenses and such other relief as this

Court shall determine to be just.

**COUNT FOUR**
**VIOLATION OF 42 U.S.C. §§ 1983 and 1988 (Civil Rights)**

302.    In Count Four, the term "individual Defendants" refers to Marshall C. Sanford, Nikki

Randhawa Haley, Anthony Keck, Beverly Buscemi, Kelly Floyd and Richard

54

Huntress.

303.    Plaintiffs adopt and restate the allegations set forth in the paragraphs above.

304.    The individual Defendants have violated Plaintiff's rights under the Medicaid Act by

diverting, under the guise of "budget reductions" funding for services which

Plaintiffs are entitled to receive.

305.    The individual Defendants have acted in concert to violate the Due Process Clause of

the Fourteenth Amendment by denying Plaintiffs' right to a fair hearing meeting the

requirements of 42 C.F.R. § 431.205 and by failing to render a final decision by an

impartial hearing officer within 90 days of receipt of the request for a fair hearing, as

is required by 42 C.F.R. §  431.221.

306.    The individual Defendants have violated the Supremacy Clause of the United States

Constitution by implementing state agency policies which conflict with the clear

directives of the Medicaid Act and the United States Constitution.

307.    Individual Defendants Buscemi, Floyd and Huntress have retaliated against Plaintiffs

and the providers who have advocated for them by terminating, or attempting to

terminate their certification as MR/RD Medicaid waiver providers.

308.    The United States Supreme Court recognized in *Olmstead* that the Medicaid statute

reflects a congressional policy preference for treatment in the community over

institutional treatment. Forcing Plaintiffs into congregate programs against their will

is a violation of their rights under the freedom of choice provisions of the Medicaid

Act.

309.    Welfare benefits are a matter of statutory entitlement for persons qualified to receive

them.  *Goldberg v. Kelly*, 397 U.S. 254 (1970).

55

310.  Defendants have violated the Plaintiffs' due process property rights and have thereby attempted to deprive Plaintiffs of life, liberty and property in violation of the Fourteenth Amendment of the United States Constitution.

311.  Upon information and belief, Defendants Sanford, Haley, Keck, Floyd, Huntress and Buscemi have acted under color of state law to deprive Plaintiffs of property rights to which they are entitled.

312.  Acting under color of state law, Defendant Keck has allowed the other Defendants to continue to act in a manner that does not protect the health and welfare of Plaintiffs and has not taken action necessary to assure that DHHS has full control over the policies and procedures of the MR/RD Medicaid waiver program.

313.  Plaintiffs request prospective relief and an order declaring their rights under the Medicaid Act as set forth herein.

314.  Plaintiffs request payment of fees, costs and expenses by the Defendants, with these fees, costs and expenses allocated in such shares and proportions as the Court determines to be appropriate and prays for such other relief as this Court shall determine to be just.

**PRAYER FOR RELIEF**

315.  Wherefore, the Plaintiffs respectfully request that this Court assume jurisdiction over this action and maintain continuing jurisdiction until defendants are in full compliance with every order of this Court.

316.  Issue an order finding that Defendants included in Counts One and Two have violated the ADA and Section 504 of the Rehabilitation Act as set forth in this Complaint.

317.   Issue an order finding that the Defendants included in Count Three have violated the

56

Medicaid Act.

318.  Plaintiffs request an order prohibiting the Defendants from reducing MR/RD

Medicaid waiver services and requiring Defendants to restore all services which were

reduced or eliminated by amendments to the State's Medicaid applications to CMS.

319.  Plaintiffs request an order directing Defendants to provide all home and community

based services which are determined by participants' responsible treating physicians

to be medically necessary, so long as the cost of these services is less than the cost of

their care in a  Regional Center, except where the orders of the treating physician

involve Medicaid fraud or are outside of the reasonable standards of medical care, as

determined by responsible and unbiased medical professionals.

320.  Plaintiff's request the relief requested in this complaint and such other relief as shall

be determined by this Court to be just and equitable, including payment of legal fees

and costs of this action.

321.  Declare that individual Defendants Sanford, Haley, Keck, Floyd, Huntress and

Buscemi have acted to deny the civil rights of the Plaintiffs in violation of 42 U.S.C.

§§  1983 and 1988.

Respectfully submitted,

s/Patricia L. Harrison
Patricia Logan Harrison                       Kenneth C. Anthony, Jr.
611 Holly Street                              Anthony Law Firm
Columbia, South Carolina 29205                PO Box 3565
plh.cola@att.net                              Spartanburg, South Carolina
                                              29304
803 256 2017                                  kanthony@anthonylaw.com
Fed. Ct. No. 6963                             864 582 2355
                                              Fed. Ct. No.

May 25, 2011