Exhibit 3
Affidavit of Barbara Morgan dated March 30, 2012

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Peter B., Jimmy "Chip" E. and Michelle M., <br>         Plaintiffs <br><br> vs. <br><br> Marshall C. Sanford, Emma Forkner, Beverly Buscemi, Kelly Floyd, The South Carolina Department of Health and Human Services, The South Carolina Department of Disabilities and Special Needs, <br>         Defendants. | ) Civil Action No. 6:10-767-TMC <br><br><br><br><br> Affidavit of Barbara M. |

1. I am the mother and primary caregiver for Michelle M., who is a plaintiff in this case and was an appellant in the case referred to as the "consolidated case."

2. In the consolidated case, the South Carolina Administrative Law Court held that the January 1, 2012 reductions were a "binding norm" and that DHHS would prohibited from enforcing them, because they violated the South Carolina Administrative Law Court.

3. The only "notice" of the January 1, 2012 reductions in the MR/RD Medicaid waiver program we received was a letter sent out in December of 2009.

4. This letter stated that the reason for the reductions was the severe budget reductions, and it did not reference any law or regulation.

5. We were told that it would be useless to object to the reductions and were not provided with written notice of our rights to appeal.

6. We were told that we, as Michelle's parents, would have to repay DDSN for the services they provide due to an appeal, but once we retained a lawyer, she told us that DDSN cannot require parents to pay the cost of services.

7. When we asked for an appeal, our request was denied and Michelle's case was dismissed by the DHHS hearing officer.

8. When I asked what residential options were available for Michelle if these cuts were enacted, I was told that there were no beds and, for years, our requests for institutional respite have been denied because we were told that funding was not available.

9. Last year, there was a change in the quality of diapers and now Michelle's diapers "leak" making her more likely to have skin break down or to get an infection, but we were not provided with written notice of Michelle's right to appeal this change in supplies.

10. The Laurens County Disabilities and Special Needs Board informed me that I would have to agree to be the employer of record for Michelle's respite caregiver and gave us forms to fill out.

11. My lawyer reviewed the forms and instructed me not to sign them, but it is my understanding that DDSN has tried to hold other families liable when a caregiver is injured on the job and I expect that they will do the same for Michelle once this case is ended.

12. It is likely that once this lawsuit is dismissed, DDSN will force us to sign papers agreeing to be liable as the employer of Michelle's respite services, but we are not able to pay the cost of worker's compensation, unemployment or liability insurance.

13. Parents are afraid of retaliation if they complain about services and my biggest fear is that DDSN will reduce Michelle's services because we have complained, so that we would be forced to put her back in a DDSN Regional Center.

14. When Michelle's doctor ordered nursing services, those services were not

provided promptly and it took months to get the nursing in place due to the administrative delays by DDSN.

15. I do not believe that nursing services would have been provided except for this lawsuit being in this Court and I expect them to be reduced or eliminated if Michelle's case is dismissed.

16. DDSN refused to give Michelle a hearing to contest the violation of the Americans with Disabilities Act and violations of the Medicaid Act.

17. The stress on our family because of the threats to reduce Michelle's services has had detrimental effects on the health of her father and on me.

18. Michelle's father's carotid artery is 90% blocked and he was in the hospital recently for a week.

19. Under the present policies of DDSN, we are unable to obtain additional PCA services, even during this appeal, when I have to be with my husband at the hospital.

20. When Michelle has to go to the hospital, someone has to be with her 24 hours a day, but DDSN will not allow her PCA or respite provider to attend to her needs in the hospital.

21. Michelle has been hospitalized for a mass in her lungs and she may need surgery/

22. Michelle has not been sleeping for weeks and she wakes up four and five times during the night.

23. It is impossible to tell when she will wake up in the morning, but she needs assistance immediately upon waking up.

24. If she is awakened early, it increases the number of seizures she has.

25. When Michelle gets up, it takes an hour to shower her and wash her hair.

3

26. It takes 15 to 20 minutes to brush her teeth, even longer if she refuses to open her mouth, but you just have to wait until she is ready.

27. After her teeth are brushed, it takes half an hour to dry her hair because you have to wrestle with her because she does not like the hair dryer.

28. Then you have to put lotion on her body to prevent skin break downs.

29. After that, it is necessary to clear her g tube and catheter, which have to be washed and dried.

30. After that, Michelle has to be dressed, which can take 15 to 20 minutes, depending on whether she cooperates.

31. After Michelle is dressed, the PCA must empty her catheter bag and to record her output on a chart, because she is limited to 1,000 ml.

32. When this is done, Michelle is brought into the living room and she has to be positioned just right to prevent reflux.

33. You have to put pillows around her head and side and in between her feet, because they can get caught in the chair and break her ankle.

34. The pillows also help with skin break down.

35. When she is brought into the living room, I feed her.

36. Michelle has to be taken to the bathroom every 2 hours to prevent urinary tract infections.

37. Also, her doctors have ordered that she move around, but she has to have someone right with her, or she will fall.

38. It usually takes 45 minutes in the bathroom for her to have a bowel movement and she has to have someone right there with her, or she will fall.

39. In spite of being taken to the bathroom frequently, she has to wear diapers

because she has accidents in between.

40. After she has a bowel movement, Michelle has to be taken back to her room, with pads put on her bed to be cleaned up with gloves, diapers, wipes and body wash.

41. The diapers DDSN has been providing recently allow leakage and require more frequent changing.

42. When Michelle has an accident in the bed, it has to be changed and the sheets have to be washed.

43. The PCA caregiver has to be nearby all the time, because Michelle will try to get up and will pull her g tube out.

44. Some of the PCA caregivers who come to our home are afraid to use the lift with Michelle because she gets banged against the door of the bathroom and her room.

45. I am not able to lift Michelle by myself, even with the lift.

46. One PCA saw a lady break her arm in a nursing home using a lift and she does not like to use the lift because she is afraid Michelle will fall.

47. If we did not have the PCA hours, I would be unable to leave the house during the day to take care of errands like grocery shopping and going to the doctor myself.

48. If DDSN reduced Michelle's PCA services, we would not be able to care for her in our home and she would have to go into an institution.

49. It is impossible to "schedule" all of the hands on care that Michelle needs throughout the day.

50. Since this lawsuit was filed, Defendants have continued to implement changes to the waiver that adversely affect Michelle without promulgating regulations.

I have read and signed this statement on March 30, 2012 and it is true to the best of my knowledge and belief.

*Barbara Morgan*
Barbara M.

SWORN TO BEFORE ME ON
this 30th day of March, 2012.

Patricia L. Harrison
Notary Public for South Carolina

6